Kevin Mahoney (SBN: 235367)
kmahoney@mahoney-law.net
Katherine J. Odenbreit (SBN: 184619)
kodenbreit@mahoney-law.net
John A. Young (SBN: 299809)
jyoung@mahoney-law.net
Berkeh Alemzadeh Mahoney (SBN: 324834)
balem@mahoney-law.net
**MAHONEY LAW GROUP, APC**
249 East Ocean Blvd., Suite 814
Long Beach, CA 90802
Telephone: (562) 590-5550
Facsimile: (562) 590-8400

Attorneys for Plaintiffs LYLE GREENE, ERIK HALL, FRANK MAGANA, DAVID PAGES AND BRANT TANNER as individuals and on behalf of all others similarly situated.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| LYLE GREENE, as an individual, ERIK HALL, as an individual, FRANK MAGANA, as an individual, DAVID PAGES, as an individual, BRANT TANNER, as an individual and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL MOTORS, a Delaware Corporation, GENERAL MOTORS, LLC, a Delaware Limited Liability Company; GENERAL MOTORS FINANCIAL COMPANY, INC., a Texas Corporation, ALLISON | Case No.: 2:26-cv-02032-JLS-SPX<br><br>Assigned for All Purposes to: Josephine L. Staton, Courtroom 8A<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND SEEKING STATEWIDE AND NATIONWIDE FEDERAL RELIEF**<br><br>Complaint Filed: February 25, 2026<br>Trial Date: Not Yet Set |

TRANSMISSION, INC, a Delaware Corporation; ALLISON VENTURES, an unknown business entity, and DOES 1-10, inclusive,

Defendants.

Plaintiffs LYLE GREENE, ERIK HALL, FRANK MAGANA, DAVID PAGES and BRANT TANNER (hereinafter "Plaintiff Greene," "Plaintiff Tanner," "Plaintiff Magana," Plaintiff Pages," and "Plaintiff Tanner" or "Plaintiffs" collectively) on behalf of themselves and all others similarly situated, complain and alleges as follows:

## NATURE OF THE CASE

1. This is a putative class action brought on behalf of Plaintiffs Greene, Magana, and Tanner and all others similarly situated which arises from the conduct and business practices of Defendants GENERAL MOTORS, GENERAL MOTORS, LLC, and GENERAL MOTORS FINANCIAL COMPANY, INC. (hereinafter "GMC," "GML", "GMF", or "GM Defendants" or collectively referred to as "Defendants") and Defendants ALLISON TRANSMISSION, INC. (hereinafter "Allison," "Allison Defendants" or collectively "Defendants"), and ALLISON VENTURES, (hereinafter "AV," or "Allison Defendants," or collectively "Defendants").

2. During the Period of approximately January 2020 to January 2026, Defendants engaged in a pattern and practice of an unlawful "Scheme" to defraud Plaintiffs and consumers and increase the GM Defendants truck sales whereby the GM Defendants falsely advertised or allowed its co-Defendants to falsely advertise that Defendants' GM trucks, and more specifically, Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD contained "Allison" transmissions, knowing that GM Defendants' trucks do not and have not contained an actual "Allison"

transmission since on or about January 2020. At no time during the GM Defendants' advertisements did the GM Defendants and/or its co-Defendants fraudulently omitted that the subject trucks did not contain actual "Allison" manufactured transmissions.

3. During the Period of approximately January 2020 to January 2026, the GM Defendants, in furtherance of their unlawful "Scheme," advertised and sold Plaintiffs' and consumers their Manufacturer Warranty and/or Extended Manufacturer Warranty to cover the subject trucks, including but not limited to the transmission, and more specifically, the "Allison" transmission, but fraudulently omitted that their Manufacturer Warranty and/or Extended Manufacturer Warranty would not replace or fix the subject trucks transmissions with "Allison" manufactured transmissions or replacement parts.

4. The Plaintiffs and consumers do not possess the requisite expertise to know whether the subject GM trucks actually contain or contained "Allison" transmissions, rather, they relied upon Defendants advertisements to provide an accurate and truthful description of the vehicle and its component parts. Furthermore, the Plaintiffs and consumers, do not and did not possess the requisite expertise to discern that the GM Defendants' Manufacturer Warranty and/or extended Manufacturer's Warranty would not cover the replacement of an actual "Allison" manufactured transmission or repair of the alleged "Allison" transmission with "Allison" manufactured parts.

5. Without the Plaintiffs and consumers being made aware, Defendants collectively designated and advertised the GM Defendants' trucks as having an "Allison" transmission, despite the fact that the transmissions in the subject trucks are transmissions "manufactured" by the GM Defendants and not by "Allison."

6. Without the Plaintiffs and consumers being made aware, Defendants collectively designated and advertised and sold the GM Defendants' trucks with a warranty, that misled Plaintiffs and consumers into believing that the alleged

"Allison" transmission would be covered, despite the fact that the transmissions in the subject trucks are not transmissions by Allison, but "manufactured" by the GM Defendants.

7. It was not until after the purchase of their trucks, that the Plaintiffs were made aware that Defendants had ended their "agreement and/or partnership" of installing actual "Allison" transmissions, while allowing the GM Defendants to advertise the use of genuine "Allison" transmissions by placing an "Allison Transmission" Badge on the subject vehicles since approximately the beginning of 2020.

8. Defendants acted in concert by utilizing the "Allison Badge" to falsely advertise the GM Defendants' subject trucks as having an "Allison" transmission, to increase the price of the subject trucks and mislead consumers into believing the trucks contained a transmission manufactured by Allison when in reality since at least 2020, the GM Defendants installed its own GM manufactured transmission, the 10L1000 which is believed to be co-developed with Ford. However, the GM Defendants' manufacturer sticker fraudulently displayed to Plaintiffs and consumers as well as various forms of advertising expressly advertised the subject trucks as containing an "Allison" transmission.

9. It was not until approximately somewhere around November or December 2025, that Plaintiffs were alerted to the end of the fraudulent "Scheme,' and furthermore, that the GM Defendants would be required to remove any reference to "Allison" transmissions beginning in or around January 2026. More specifically, it is Plaintiffs understanding that the "Allison" transmission badge that the GM Defendants placed on its trucks would also have to be removed from any of the GM Defendants' subject trucks. The Defendants engaged in this Scheme knowing that the trucks did not in fact contain an "Allison" manufactured transmission. Plaintiffs

further believe that the GM Defendants are further required to track down trucks not yet sold to consumers and remove the Allison transmission badge before June 2026.[1]

10. Furthermore, the GM Defendants also fraudulently advertised to Plaintiffs and consumers their Manufacturer's Warranty and/or Extended Manufacturer's Warranty by omitting the fact that the subject warranties would not replace and/or repair the subject vehicles alleged "Allison" transmissions with an "Allison" manufactured transmission and/or parts.

11. The Plaintiffs and consumers were the "direct" purchasers of the GM Defendants' Manufacturer Warranty and/or Extended Manufacturer's Warranty as the cost of either was included in the price of the vehicle and the GM Defendants' are the sole owners and provider of the factory vehicle warranty.

12. Thus, the GM Defendants controlled the content of their advertisements, including their window stickers (which included the specs of the subject trucks) and emblems placed on the subject truck, and as a result of Defendants' Scheme of intentional false advertising (by omission) the Defendants collectively have obtained tens of millions of dollars in sales of the subject trucks and their Manufacturer Warranty and/or Extended Manufacturer's Warranty.

13. Due to their course of conduct, Defendants have violated California Misleading Advertising (Business and Professions Code § 17200 "Unfair Competition Law" or "UCL"), California Consumer Legal Remedies Act[2] (California Civil Code § 1780, et. seq.), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Fraud-Intentional Misrepresentation, Fraud-Concealment, Fraud-Breach of Express Warranty (Uniform Commercial Code, U.C.C.§ 2-313(1)), Breach of Implied Warranty (Uniform Commercial Code, U.C.C.§ 2-314(1), as well as other state consumer fraud laws.

---

[1] https://www.msn.com/en-us/autos/news/gm-and-allison-transmissions-break-up-could-involve-removing-badges-from-new-hd-pickup-trucks/ar-AA1PO6SE

[2] GM Defendants only as the CLRA letter to Defendant Allison has not been passed thirty (30) days.

14. Plaintiffs therefore seek declaratory, injunctive and monetary damages under the UCL, RICO, CLRA, and the U.C.C on behalf of themselves and all others similarly situated within the State of California.

## THE PARTIES

15. Plaintiff Lyle Greene is an individual residing in La Habra, California. On around November 2020, Mr. Greene purchased a 2020 GM Chevy 3500HD in November 2020 believing the truck to have an "Allison" transmission as stated in the "Monroney" window sticker, as well as the "Allison Transmission" badge that was installed on the truck. Mr. Greene previously owned a Ford FT50 diesel truck. In deciding on the purchase of a new truck, Mr. Greene made the decision to switch to the GM Chevy 3500HD because of the reputation of the "Allison" transmission that was attached to the Duramax engine at the time. Mr. Greene is an avid camper, who needed a durable high-quality transmission to pull his 5th wheel RV Camper Hauler that carried at times over three thousand (3,000) pounds of equipment for camping as well as at times pulling his boat that weighs several thousand pounds. The well-known reputation of the "Allison" transmission was well known and was made specifically for heavy duty hauling as well as military and large vehicle application. As a result, Mr. Greene chose to go with what he believed was a GM truck with an "Allison" manufactured transmission and relied on the fact that the Defendants advertised the GM Chevy 3500HD trucks as having an "Allison" transmission.

16. Plaintiff Frank Magana is an individual residing in Buckeye, Arizona. On November 8, 2025, Mr. Magana purchased a 2025 GM Chevy 2500HD truck believing the vehicle to have an "Allison" transmission as stated on the "Allison Transmission" badge that was installed on the vehicle. Mr. Magana made the decision to switch to the GM Chevy 3500HD because of the reputation of the "Allison" transmission that was attached to the Duramax engine at the time. Mr. Magana is an avid "off-roader," who pulls his "off-road vehicles on an "open trailer,"

that weight anywhere from three thousand (3,000) to four thousand (4,000) pounds. Mr. Magana was aware of the reputation of the "Allison" transmission and chose to go with the GM Chevy 2500HD as a result, due to the fact that the "Allison" transmissions were made specifically for heavy duty hauling as well as military and large vehicle application. As a result, Mr. Magama chose to go with what he believed was a GM truck with an "Allison" manufactured transmission and relied on the fact that the Defendants advertised the GM Chevy 2500HD trucks as having an actual "Allison" transmission.

17. Plaintiff Erik Hall is an individual residing in Mission Viejo, California. Mr. Hall purchased a 2024 GM Chevy 3500HD truck believing the truck to have an "Allison" transmission as stated on the "Allison Transmission" badge that was installed on the truck. Mr. Hall made the decision to purchase a GM Chevy 3500HD because of the reputation of the "Allison" transmission that was attached to the Duramax engine at the time. Mr. Hall is an avid "camper," who needed a durable high-quality transmission to pull his forty (40) foot 5th wheel RV Camper that carried in excess of ten thousand (10,000) pounds of equipment for camping. Mr. Hall was aware of the reputation of the "Allison" transmission and chose to go with the GM Chevy 3500HD as a result, due to the fact that the "Allison" transmissions were made specifically for heavy duty hauling as well as military and large vehicle application. As a result, Mr. Hall chose to go with what he believed was a GM truck with an "Allison" manufactured transmission and relied on the fact that the Defendants advertised the GM Chevy 3500HD trucks as having an actual "Allison" transmission.

18. Plaintiff David Pages is an individual residing in El Segundo, California. Mr. Hall purchased a 2024 Sierra 2500HD Denali truck believing the truck to have an "Allison" transmission as stated on the "Allison Transmission" badge that was installed on the truck. Mr. Pages made the decision to purchase a 2024 Sierra 2500HD Denali because of the reputation of the "Allison" transmission

that was attached to the Duramax engine at the time. As a result, Mr. Pages chose to go with what he believed was a 2024 GMC Sierra 2500HD Denali with an "Allison" manufactured transmission and relied on the fact that the Defendants advertised the 2024 Sierra 2500HD Denali trucks as having an actual "Allison" transmission.

19. Plaintiff Brant Tanner is an individual residing in Mesa, Arizona. On March 17, 2024, Mr. Tanner purchased a 2024 GM Chevy 2500HD truck believing the vehicle to have an "Allison" transmission as stated in the "Monroney" window sticker, as well as the "Allison Transmission" badge that was installed on the truck. Mr. Tanner made the decision to purchase a 2024 GM Chevy 3500HD because of the reputation of the "Allison" transmission that was attached to the Duramax engine at the time. Mr. Tanner previously owned a 2013 GM Chevy 2500HD, and a 2017 GM Chevy 2500HD, which both contained actual "Allison" manufactured transmissions. Mr. Tanner is an avid "camper" and "off-roader,' who needed a durable high-quality transmission to pull his 5th wheel toy hauler that carried in excess of ten thousand (10,000) pounds of equipment. Mr. Tanner was aware of the reputation of the "Allison" transmission as he had previously owned two (2) of the GM trucks and decided to purchase a new GM Chevy 3500HD as a result, due to the fact that the "Allison" transmissions were made specifically for heavy duty hauling as well as military and large vehicle application. As a result, Mr. Tanner chose to go with what he believed was a GM truck with an "Allison" manufactured transmission and relied on the fact that the Defendants advertised the GM Chevy 3500HD trucks as having an actual "Allison" transmission.

20. Defendant General Motors Company ("GMC") is a corporation organized under the laws of the State of Delaware, which operates nationwide and maintains its principal executive offices in Detroit Michigan and also operates a corporate office in Westlake Village California. At all times relevant hereto, Defendant GML was and is engaged in the business of manufacturing and selling automobiles and trucks throughout the United States, California and in this district.

21. Defendant GENERAL MOTORS, LLC ("GML") is a limited liability company organized under the laws of the State of Delaware, which operates nationwide and maintains its principal executive offices in East Lansing, Michigan, as well as is believed to operate a corporate office in El Segundo, California. At all times relevant hereto, Defendant GML was and is engaged in the business of designs, manufactures, and markets vehicles, parts, and accessories globally.

22. Defendant ALLISON TRANSMISSION, INC, a Delaware Corporation company organized under the laws of the State of Delaware, which operates nationwide and maintains its principal executive offices in Indianapolis, Indiana. At all times relevant hereto, Defendant Allison was and is engaged in the business of manufacturing and selling its transmissions to its customers throughout the state of California and the United States.

23. Defendant ALLISON VENTURES, am unknown business entity, which is believed to be an entity integrated into Allison Transmission, Inc's. At all times relevant hereto, Defendant Allison Ventures was and is engaged in advancing Allison's global strategy within the rapidly evolving mobility market. Rather than operating as a separate investment fund, Allison Ventures is integrated within Allison's corporate structure throughout the state of California and the United States.

24. DOES are fictitiously named businesses which may have liability under this action and should be made parties hereto, but whose identities are not known at this time. DOES 1-10 are engaged in the business of manufacturing and selling automobiles and trucks to consumers nationwide, including California.

25. Plaintiffs are informed and believes that each of the Defendants acted in all respects pertinent to the allegations in this notice as the agent of the other Defendants, carried out a joint scheme, business plan, or policy in all respects pertinent hereto, and the acts of each of the Defendants are legally attributable to the other Defendants. Furthermore, Defendants operate as a joint venture and/or single business enterprise, integrated enterprise and/or are agents of one another,

are alter egos, joint Defendants and conspire with one another to increase profits by engaging in the conduct described in this notice.

26. Plaintiffs are informed and believes that each of the Defendants acted in all respects as the agent, servant, partner, joint venture, alter-ego, employee, proxy, managing agent, and/or principal of the co-Defendants, and in performing the actions mentioned below was acting, at least in part, within the course and scope of that authority as such agent, proxy, servant, partner, joint venture, employee, alter-ego, managing agent, and/or principal with the permission and consent of the co-Defendants. Plaintiffs also allege the acts of each of the Defendants are legally attributable to the other Defendants.

## JURISDICTION AND VENUE

27. This action arises under the laws of the United States. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under the RICO Statute, 18 U.S.C. § 1962.

28. This Court has personal jurisdiction over Defendants because they have significant minimum contacts with this State, and intentionally availed themselves of the laws of California by transacting a substantial amount of business throughout the State and this District, including but not limited to, the promoting, marketing, advertising, and sale of its Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD trucks, including, the throughout the Central District of California, Southern Division.

29. Venue is proper in this Court under 28 U.S.C. § 1391(b). Plaintiff Hall resides in the Central District of California, Southern Division, and Defendants are located in and do business in, the Central District of California, Southern Division. Many events that are the subject of this Complaint took place in the Central District of California, Southern Division.

///

## FACTUAL ALLEGATIONS

**Plaintiff Lyle Greene**

30. Plaintiff Lyle Greene is an individual residing in La Habra, California. On November 2020, Plaintiff Green purchased a GM Chevrolet 3500 believing the truck to have an "Allison" transmission as stated in the "Monroney" window sticker, as well as the "Allison Transmission" badge that was installed on the truck. Mr. Greene previously owned a Ford FT50 diesel truck and made the decision to switch to the GM Chevy 3500HD because of the reputation of the "Allison" transmission that was attached to the Duramax engine at the time. Mr. Greene. is an avid camper, who needed a durable high-quality transmission to pull his 5th wheel RV Camper Hauler that carried at times over three thousand (3,000) pounds of equipment for camping as well as at times pulling his boat that weighs several thousand pounds. The well-known reputation of the "Allison" transmission was well known and was made specifically for heavy duty hauling as well as military and large vehicle application. As a result, Mr. Greene chose to go with what he believed was a GM truck with an "Allison" manufactured transmission and relied on the fact that the Defendants advertised the GM Chevy 3500HD trucks as having an actual "Allison" transmission.

31. On November 20, 2020, Plaintiff Greene visited one of the GM Defendants' authorized dealerships (Bradley Chevrolet). Plaintiff was looking for a truck, and after speaking with the salesperson, Plaintiff Greene was interested in a Chevrolet 3500. As a result of the collective advertising of the Defendants, Plaintiff ordered a 2020 black Chevrolet 3500HD. On the truck, it specifically had the "Allison Transmission" badge, and a Monroney window sticker, which falsely stated that the subject truck contained an "Allison" transmission.

32. As a result of Defendants' representation, Plaintiff Greene decided to purchase the truck. Mr. Greene settled on the GM truck due in part to Defendants' representation of the subject truck containing an "Allison" transmission. As a result,

Plaintiff Greene paid eighty-one thousand sixty dollars ($81,060.00) for the truck.

33. Defendants never advised Plaintiff Greene that the subject truck did not in fact contain an "Allison" manufactured transmission, and omitted that the subject truckcontained GM designed and manufactured transmission which had and has been known to have problems and has faced various recalls as a result. Plaintiff Greene paid a premium for the subject truck due to the representation it contained a genuine Allison transmission.

34. Plaintiff Greene was not provided any document to advise him that the subject truck did not contain an "Allison" manufactured transmission. Plaintiff Greene was never informed that Defendant and "Allison" had either ended and/or modified their partnership wherein "Allison" provided its transmissions to the GM Defendants for use in the truck models that are subject of this action or that Allison had granted a "license" to GM to affix the Allison badge on a GM manufactured transmission.

35. Based upon the fact that the Defendants manufactured the truck, the representations of Defendants and the fact that the subject trucks falsely advertised that it contained an "Allison" transmission, both on the truck itself (i.e., "Allison Badge") and the "Monroney" window sticker, and the GM Defendants' omissions by design, Plaintiff Greene relied upon Defendants to provide him with a truck that contained the various parts as advertised and a warranty that would replace and repair any and all items that was included in the subject truck. This reliance is what induced Plaintiff Green to purchase the subject truck.

36. Moreover, Plaintiff Greene was not provided with material information necessary to make an informed decision on such an important aspect of the subject truck, as "Allison Transmissions" are known for their heavy-duty capacity, unlike the Defendant's transmissions. Plaintiff Greene, also relied on the GM Defendants' fraudulent advertisement in that, he believed that the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty would include

replacement and/or repair of the “Allison” transmission should it be necessary. These material omissions induced Plaintiff Greene to purchase that specific vehicle.

37. Thereafter, the only notice that Plaintiff Greene ever received about the Defendants trucks not containing “Allison” transmissions, was through the internet in or around November 2025.

38. Defendants’ authorized sales representative, with whom Plaintiff Greene spoke, did not advise him that the subject truck did not have an “Allison” manufactured transmission as falsely advertised on the truck itself and the “Monroney” window sticker; nor did Mr. Greene ever attempt to solicit, request an inspection of the transmission installed in the subject vehicle. Instead, based upon the fact that Defendants manufactured trucks, previously had an agreement with “Allison” to utilize their transmissions, and did use the “Allison” transmissions, as well as the false advertisement (including material omissions) of the subject truck, Plaintiff Greene continued to rely upon the false and misleading advertising with respect to the subject truck to his detriment.

39. It was therefore much to Plaintiff Greene’s surprise when he learned that not only did GM and Allison end their agreement sometime in 2019, but furthermore that Defendants had not installed “Allison” transmissions since on or about 2020, and that the Defendants were engaging in deceptive and false advertising by having its trucks display an “Allison” badge as well as stating the same on the “Monroney” window sticker,” but omitting the fact that it did not actually contain an “Allison” transmission as well as the Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty would not repair and/or replace the alleged “Allison” transmission with an “Allison” manufactured transmission and/or “Allison” replacement parts. Furthermore, Mr. Greene would not have purchased the truck had he known that the truck did not contain an actual “Allison” manufactured transmission and that the Maufacturer’s Warranty and/or Extended Manufacturer’s Warranty would not provide a replacement by way of an actual

"Allison" manufactured transmission and/or replacement parts.

40. As a result of Defendants' actions, Plaintiff Greene was misled and fraudulently induced into purchasing the subject vehicle for approximately eighty-one thousand sixty dollars ($81,060.00).

**Plaintiff Frank Magana**

41. Plaintiff Frank Magana is an individual residing in Buckeye, Arizona. Mr. Magana purchased a GM Chevrolet 2500 HD believing the truck to have an "Allison" transmission as indicated on the "Allison Transmission" badge on the hood of the truck in plain view.

42. On November 8, 2025, Plaintiff Magana visited one of the GM Defendants' authorized independent dealerships (Midway Chevrolet-Phoenix, Arizona), Plaintiff was looking for a truck, and after speaking with the salesperson, Plaintiff Magana was interested in a Chevrolet 2500 HD. Plaintiff was shown a white Chevrolet 2500 HD with a badge on the hood indicating it contained an "Allison" transmission and GM Duramax engine.

43. As a result of Defendants' representation that the truck contained an Allison transmission, Plaintiff Magana decided to purchase the truck. Mr. Magana settled on the GM truck due to Defendants' false advertising of the subject truck containing an "Allison" transmission. As a result, Plaintiff Magana paid approximately ninety-nine thousand eight hundred fifteen dollars ($99,815.00) for the truck.

44. Defendants never advised Plaintiff Magana that the subject truck did not in fact contain an "Allison" transmission, and omitted that the subject truck contained GM manufactured transmission which had and has been known to have problems and has faced various recalls as a result. Plaintiff Magana paid a premium for the subject truck.

45. Plaintiff Magana was not provided with any document to advise him that the subject truck did not contain an "Allison" transmission. Plaintiff Magana

was not aware until approximately December, 2025, Defendant and "Allison" had modified their partnership wherein "Allison" provided use of its brand badge to GM to place on GM manufactured transmissions for use in the truck models that are subject of this action.

46. Based upon the fact that the Defendants manufactured the truck, the representations of Defendants and the fact that the subject vehicle falsely advertised that it contained an "Allison" transmission, both on the truck itself (i.e., "Allison Badge"), and the GM Defendants' omissions by design, Plaintiff Magana relied upon Defendants to provide him with a truck that contained the specific Allison transmission as advertised and a warranty that would replace and repair any and all items that was included in the subject truck. Reliance on these statements is what induced Plaintiff Magna to purchase the subject truck.

47. Moreover, Plaintiff Magana was not provided with material information necessary to make an informed decision on such an important aspect of the subject truck, as "Allison Transmissions" are known for their heavy-duty capacity, unlike the Defendant's transmissions. Plaintiff Magana also relied on the GM Defendant's fraudulent advertisement in that, he believed that the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty would include replacement and/or repair of the "Allison" transmission should it be necessary. These material omissions induced Plaintiff Magana to purchase the specific vehicle.

48. Thereafter, the only notice that Plaintiff Magana ever received about the Defendants' trucks not containing "Allison" manufactured transmissions, was through the internet around December 2025, wherein it was learned that the Defendants had either ended or modified their partnership, whereby, Allison at some point stopped providing its "transmissions" to GM and subsequently allowed GM to advertise its own transmissions as "Allison" transmissions. It was further learned at that time that Allison had ended the practice of allowing GM to advertise the

"Allison" transmission in its trucks and required the removal of any such description from its trucks beginning in 2026.

49. Defendants' authorized sales representative, with whom Plaintiff Magana spoke, did not advise him that the subject truck did not have an "Allison" manufactured transmission as falsely advertised on the truck itself; nor did Mr. Magana ever attempt to solicit, request an inspection of the transmission installed in the subject truck. Instead, based upon the fact that Defendants manufactured the trucks, previously had an agreement with "Allison" to utilize their transmissions, and actually did use the "Allison" transmissions, as well as the false advertisement (including material omissions) of the subject truck, Plaintiff Magana continued to rely upon the false and misleading advertising with respect to the subject truck.

50. It was therefore much to Plaintiff Magana 's surprise on or around December 2025, when he learned that not only did GM and Allison end their agreement sometime in 2019 for Allison to provide its transmissions to GM, but furthermore that Defendants had not installed "Allison" manufactured transmissions since on or about 2020, and that the Defendants were engaging in deceptive and false advertising by having its trucks display an "Allison" badge, but omitting the fact that it did not actually contain an "Allison" transmission as well as the Manufacturer's Warranty and/or Extended Manufacturer's Warranty would not repair and/or replace the alleged "Allison" transmission with an "Allison" manufactured transmission and/or "Allison" replacement parts. Furthermore, Mr. Magana would not have purchased the truck had he known that the truck did not contain an actual "Allison" manufactured transmission and that the Manufacturer's Warranty and/or Extended Manufacturer's Warranty would not provide a replacement by way of an actual "Allison" manufactured transmission and/or replacement parts.

51. As a result of Defendant's actions, Plaintiff Magana was misled and fraudulently induced into purchasing the subject truck for approximately ninety-nine thousand eight hundred fifteen dollars ($99,815.00).

**Plaintiff David Pages**

52. Plaintiff David Pages is an individual residing in El Segundo, California. Mr. Hall purchased a 2024 Sierra 2500HD Denali truck believing the truck to have an "Allison" transmission as stated on the "Allison Transmission" badge that was installed on the truck.

53. On or about August 17, 2023, Mr. Pages visited one of the GM Defendants' authorized independent dealerships (Simpson Buick GMC of Buena Park), Plaintiff was looking for a truck, and after speaking with the salesperson, Plaintiff Pages was interested in purchasing a truck Plaintiff was shown a white 2024 Sierra 2500HD Denali truck with a badge on the hood indicating it contained an "Allison" transmission and GM Duramax engine.

54. As a result of Defendants' representation that the truck contained an Allison transmission, Plaintiff Magana decided to purchase the truck. Mr. Magana settled on the GM truck due to Defendants' false advertising of the subject truck containing an "Allison" transmission. As a result, Plaintiff Magana paid approximately ninety-four thousand four hundred forty dollars ($94,440.00) for the truck.

55. Defendants never advised Plaintiff Pages that the subject truck did not in fact contain an "Allison" transmission, and omitted that the subject truck contained a GM manufactured transmission which had and has been known to have problems and has faced various recalls as a result. Plaintiff Pages paid a premium for the subject truck.

56. Plaintiff Pages was not provided with any document to advise him that the subject truck did not contain an "Allison" transmission. Plaintiff Pages was not aware until approximately December 2025 or January 2026, Defendant and "Allison" had modified their partnership wherein "Allison" provided use of its brand badge to GM to place on GM manufactured transmissions for use in the truck models that are subject of this action.

57. Based upon the fact that the Defendants manufactured the truck, the representations of Defendants and the fact that the subject vehicle falsely advertised that it contained an "Allison" transmission, both on the truck itself (i.e., "Allison Badge"), and the GM Defendant's omissions by design, Plaintiff Pages relied upon Defendants to provide him with a truck that contained the specific Allison transmission as advertised and a warranty that would replace and repair any and all items that was included in the subject truck, such as the alleged "Allison" transmission. Reliance on these statements is what induced Plaintiff Pages to purchase the subject truck.

58. Moreover, Plaintiff Pages was not provided with critical information necessary to make an informed decision on such an important aspect of the subject truck, as "Allison Transmissions" are known for their heavy-duty capacity, unlike the Defendant's transmissions. Plaintiff Pages also relied on the GM Defendant's fraudulent advertisement in that, he believed that the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty would include replacement and/or repair of the "Allison" transmission should it be necessary. These material omissions induced Plaintiff Pages to purchase the specific vehicle.

59.

60. Thereafter, the only notice that Plaintiff Pages ever received about the Defendants' trucks not containing "Allison" manufactured transmissions, was around December 2025 or January 2026.

61. Defendants' authorized sales representative, with whom Plaintiff Pages spoke, did not advise him that the subject truck did not have an "Allison" manufactured transmission as falsely advertised on the truck itself; nor did Mr. Pages ever attempt to solicit, request an inspection of the transmission installed in the subject truck. Instead, based upon the fact that Defendants manufactured the trucks, previously had an agreement with "Allison" to utilize their transmissions, and actually did use the "Allison" transmissions, as well as the false advertisement

(including omissions) of the subject truck, Plaintiff Pages continued to rely upon the false and misleading advertising with respect to the subject truck.

62. It was therefore much to Plaintiff Pages' surprise on or around December 2025 or January 20, when he learned that Defendants had not installed "Allison" manufactured transmissions since on or about 2020, and that the Defendants were engaging in deceptive and false advertising by having its trucks display an "Allison" badge, but omitting the fact that it did not actually contain an “Allison” transmission as well as the Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty would not repair and/or replace the alleged “Allison” transmission with an “Allison” manufactured transmission and/or “Allison” replacement parts. Furthermore, Mr. Pages would not have purchased the truck had he known that the truck did not contain an actual “Allison” manufactured transmission and that the Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty would not provide a replacement by way of an actual “Allison” manufactured transmission and/or replacement parts.

63. As a result of Defendants’ actions, Plaintiff Pages was misled and fraudulently induced into purchasing the subject truck for approximately ninety-four thousand four hundred forty dollars ($94,440.00).

**Plaintiff Brant Tanner**

64. Plaintiff Brant Tanner is an individual residing in Mesa, Arizona. Mr. Tanner purchased a GM Chevrolet 2500 believing the vehicle to have an "Allison" transmission as stated in the "Monroney" window sticker, as well as the "Allison Transmission" badge that was installed on the vehicle.

65. Plaintiff Tanner visited one of the GM Defendants’ network of authorized independent dealerships (Auto Nation Chevrolet), in Mesa Arizona. Plaintiff Tanner was looking for a truck, and after speaking with the salesperson, Plaintiff Tanner was interested in a Chevrolet 2500HD. Plaintiff was shown a white GM Chevrolet 2500 HD. On the truck, it specifically had the "Allison Transmission"

badge, and the window sticker, also known as the "Monroney" sticker contained false information that the subject truck contained an "Allison" transmission. See **Exhibit A**, a true and correct copy of Plaintiff Tanner's Monroney Sticker.

66. As a result of Defendants' representation, Plaintiff Tanner decided to purchase the truck. Mr. Tanner settled on the GM truck due to Defendants' false advertising of the subject truck containing an "Allison" transmission. As a result, Plaintiff Tanner paid approximately one hundred thousand eight hundred dollars ($100,800.00) for the vehicle.

67. Plaintiff Tanner had been aware of the inclusion of the "Allison" transmission and the reputation of the "Allison" transmission in the GM trucks, as he had previously on two (2) occasions purchased GM trucks with the "Allison" manufactured transmissions.

68. Defendants never advised Plaintiff Tanner that the subject truck did not in fact contain an "Allison" manufactured transmission, and omitted that the subject truck contained a GM transmission which had and has been known to have problems and has faced various recalls as a result. Plaintiff Tanner paid a premium for the subject truck.

69. Plaintiff Tanner was not provided with any document to advise him that the subject truck did not contain an "Allison" manufactured transmission. Plaintiff Tanner was not told that the GM Defendants and "Allison" had ended and/or modified their partnership wherein "Allison" provided its transmissions to GM for use the truck models that are subject of this action.

70. Based upon the fact that the Defendants manufactured the truck, the representations of Defendants and the fact that the subject truck falsely advertised that it contained an "Allison" transmission, both on the truck itself (i.e., "Allison Badge") and the "Monroney" window sticker, and the GM Defendants' omissons by design, Plaintiff Tanner relied upon Defendants provide him with a truck that contained the various parts as advertised and a warranty that would replace and

repair any and all items that was included in the subject truck, including the alleged “Allison” transmission. This reliance is what induced Plaintiff Tanner to purchase the subject truck.

71. Moreover, Plaintiff Tanner was not provided with critical information necessary to make an informed decision on such an important aspect of the subject truck, as "Allison Transmissions" are known for their heavy-duty capacity, unlike the GM Defendant's transmissions. Plaintiff Tanner also relied on the GM Defendants’ fraudulent advertisement in that; he believed that the GM Defendants’ Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty would include replacement and/or repair of the “Allison” transmission should it be necessary. These material omissions induced Plaintiff Tanner to purchase the specific vehicle.

72. Thereafter, the only notice that Plaintiff Tanner ever received about the Defendants trucks not containing "Allison" transmissions, was on or around November 2025 through the internet, wherein it was learned that the Defendants had either ended or modified their partnership, whereby, Allison at some point stopped providing its “transmissions” to the GM Defendants and subsequently allowed the GM Defendants to advertise their own transmissions as “Allison” transmissions. It was further learned that Allison had ended the practice of allowing the GM Defendants to advertise the “Allison” transmission in their trucks and required the removal of any such description from its trucks beginning in 2026.

73. Defendants' authorized sales representative, with whom Plaintiff Tanner spoke, did not advise him that the subject truck did not have an "Allison" manufactured transmission as falsely advertised on the truck itself and the "Monroney" window sticker; nor did Mr. Tanner ever attempt to solicit, request an inspection of the transmission installed in the subject truck. Instead, based upon the fact that Defendants manufactured trucks, previously had an agreement with "Allison" to utilize its transmissions, and actually did use "Allison" transmissions, as well as the false advertisement (including omissions) of the subject truck, Plaintiff

Tanner continued to rely upon the false and misleading advertising with respect to the subject truck.

74. It was therefore much to Plaintiff Tanner's surprise when he learned on or around October 2025 that not only did GM and Allison end their agreement sometime in 2019, but furthermore that Defendants had not installed "Allison" transmissions since on or about 2020, and that the Defendants were engaging in deceptive and false advertising by having Defendant GM tricks display an "Allison" badge as well as stating the same on the "Monroney" window sticker," but omitting the fact that it did not actually contain an “Allison” transmission as well as the Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty would not repair and/or replace the alleged “Allison” transmission with an “Allison” manufactured transmission and/or “Allison” replacement parts. Furthermore, Mr. Magana would not have purchased the truck had he known that the truck did not contain an actual “Allison” manufactured transmission, and that the Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty would not provide a replacement by way of an actual “Allison” manufactured transmission and/or replacement parts.

75. As a result of Defendants’ actions, Plaintiff Tanner was misled and fraudulently induced into purchasing the subject vehicle for approximately one hundred thousand eight hundred dollars ($100,800.00).

**Plaintiff Erik Hall**

76. Plaintiff Erik Hall is an individual residing in Mission Viejo, California. Mr. Hall purchased a 2024 GM Chevy 3500HD truck from Simpson Chevrolet believing the truck to have an “Allison” transmission as stated on the “Allison Transmission” badge that was installed on the truck.

77. Plaintiff Hall visited one of the GM Defendants authorized network of independent dealerships, Simpson Chevrolet, in Irvine, California. Plaintiff Hall was looking for a truck, and after speaking with the salesperson, Plaintiff Hall became

interested in a Chevrolet 2500.HD. Plaintiff was shown a 2024 GM Chevrolet 2500 HD. On the truck, it specifically had the "Allison Transmission" badge, and the window sticker, also known as the "Monroney" window sticker contained false information that the subject truck contained an "Allison" transmission. See **Exhibit B**, a true and correct copy of Plaintiff Halls's Monroney Sticker, and **Exhibit C**, a picture of the "Allison" badge on the subject truck.

78. As a result of Defendants' representation, Plaintiff Hall decided to purchase the truck. Mr. Hall settled on the GM truck due to Defendants' false advertising of the subject truck containing an "Allison" transmission. As a result, Plaintiff Hall paid approximately eighty-four thousand dollars ($84,000.00) for the vehicle.

79. Defendants never advised Plaintiff Hall that the subject truck did not in fact contain an "Allison" manufactured transmission, and omitted that the subject truck contained a GM transmission which had and has been known to have problems and has faced various recalls as a result. Plaintiff Hall paid a premium for the subject truck.

80. Plaintiff Hall was not provided with any document to advise him that the subject truck did not contain an "Allison" manufactured transmission. Plaintiff Hall was not told that the GM Defendants and "Allison" had ended and/or modified their partnership wherein "Allison" provided its transmissions to GM for use the models that are subject of this action.

81. Based upon the fact that the Defendants manufactured the truck, the representations of Defendants and the fact that the subject truck falsely advertised that it contained an "Allison" transmission, as the truck had the "Allison Badge") and the GM Defendants' omissions by design, Plaintiff Hall relied upon Defendants to provide him with a truck that contained an actual "Allison" transmission as advertised and a warranty that would replace and repair any and all items that was included in the subject truck, including the alleged "Allison" transmission. This

reliance is what induced Plaintiff Hall to purchase the subject truck.

82. Moreover, Plaintiff Hall was not provided with material information necessary to make an informed decision on such an important aspect of the subject truck, as "Allison Transmissions. " Plaintiff Hall also relied on the GM Defendants' fraudulent advertisement in that, he believed that the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty would include replacement and/or repair of the "Allison" transmission should it be necessary. These material omissions induced Plaintiff Hall to purchase the specific vehicle.

83. Thereafter, the only notice that Plaintiff Hall ever received about the Defendants trucks not containing "Allison" transmissions, was on or around October/November 2025 through the internet, wherein it was learned that the Defendants had either ended or modified the Scheme, whereby, Allison at some point stopped providing its "transmissions" to GM and subsequently allowed GM Defendants to advertise their own transmissions as "Allison" transmissions. It was further learned that Allison ended the practice of allowing GM Defendants to advertise the "Allison" transmission in their trucks and required the removal of any such description from its trucks beginning in 2026.

84. Defendants' authorized sales representative, with whom Plaintiff Hall spoke, did not advise him that the subject truck did not have an "Allison" manufactured transmission as falsely advertised on the truck itself and the "Monroney" window sticker; nor did Mr. Hall ever attempt to solicit, request an inspection of the transmission installed in the subject truck. Instead, based upon the fact that Defendants manufactured trucks, previously had an agreement with "Allison" to utilize its transmissions, and actually did use "Allison" transmissions, as well as the false advertisement (including material omissions) of the subject truck, Plaintiff Hall continued to rely upon the false and misleading advertising with respect to the subject truck.

///

85. It was therefore much to Plaintiff Hall's surprise when he learned on or around October 2025 that not only did GM and Allison end the Scheme sometime in 2019, but furthermore that Defendants had not installed "Allison" transmissions since on or about 2020, and that the Defendants were engaging in deceptive and false advertising by having the subject trucks display an "Allison" badge as well as stating the same on the "Monroney" window sticker," but omitting the fact that it did not actually contain an “Allison” transmission as well as the Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty would not repair and/or replace the alleged “Allison” transmission with an “Allison” manufactured transmission and/or “Allison” replacement parts. Furthermore, Mr. Hall would not have purchased the truck had he known that the truck did not contain an actual “Allison” manufactured transmission and that the Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty would not provide a replacement by way of an actual “Allison” manufactured transmission and/or replacement parts.

86. As a result Defendants’ actions, Plaintiff Hall was misled, Plaintiff was fraudulently induced into purchasing the subject truck for approximately eighty-four thousand dollars ($84,000.00).

## RICO ALLEGATIONS

87. The GM Defendants maintained and continues to maintain design and engineering in the state of California and throughout the United States. Furthermore, while the GM Defendants allegedly does not own any dealerships in California, the GM Defendants advertise and sell their cars and trucks through a network of independently owned and authorized dealerships. Defendants authorize these dealerships to sell its products as advertised and manufactured as evidenced by the “Monroney” window stickers on their trucks and its inclusion of the GM Defendants’ Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty into the price of the subject vehicle. The GM Defendants’ Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty is owned and sponsored by the GM

Defendants and they receive payment directly from the Plaintiffs and consumers upon the purchase or lease of the subject trucks.

88. The Allison Defendants, who holds themselves out as a "global leader" in automatic transmissions, are in the business of designing, marketing and manufacturing transmissions under the "Allison" brand. While the Allison Defendants' do not manufacture its transmissions in California, they do allow "authorized dealers" and "independent companies" to provide "remanufacturing and service in California, as well as throughout the United States.

89. At all times relevant hereto, Defendants conducted substantial business throughout the State of California, including their marketing, advertising, and selling of the Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD trucks with "Allison" transmission.

90. The Allison Defendants and the GM Defendants previously entered into an agreement where the Allison Defendants would provide Allison manufactured transmissions to the GM Defendants to include in the GM Defendants Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD. Sometime in or around the year 2019 or 2020, the Defendants agreed to end and/or modify their "partnership" wherein Allison would no longer provide its transmissions to the GM Defendants, but entered into a fraudulent Scheme, wherein the Allison Defendants agreed to allow the GM Defendants to use the "Allison" name for "validation and marketing of the GM Defendants' newly manufactured transmissions in the subject truck. At no time did the Defendants inform Plaintiffs or the general public that the transmissions in the GM Defendants Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD trucks were not actual "Allison" manufactured transmissions. In fact, the Defendants instead entered into a fraudulent Scheme, wherein they agreed

to continue marketing the subject trucks as containing "Allison" transmissions, all the while knowingly, willingly, intentionally and/or negligently misleading the Plaintiffs and general public (by omission) into believing that the GM manufactured transmissions were in fact "Allison" manufactured transmission.

91. GENERAL MOTORS is an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which conducted the pattern of racketeering activity described herein. Defendants engaged in, and their activities affected interstate commerce because it involved commercial activities across state lines, including national marketing campaigns, and the solicitation and receipt of money from victims located throughout the country.

92. GENERAL MOTORS, LLC is an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which conducted the pattern of racketeering activity described herein. Defendants engaged in, and their activities affected interstate commerce because it involved commercial activities across state lines, including national marketing campaigns, and the solicitation and receipt of money from victims located throughout the country.

93. ALLISON TRANSMISSION, INC is an "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which Defendants conducted a pattern of racketeering activity described herein. Defendants engaged in, and their activities affected interstate commerce because it involved commercial activities across state lines, including national marketing campaigns, and the solicitation and receipt of money from victims located throughout the country.

94. ALLISON VENTURES, is an "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the GM Defendant conducted a pattern of racketeering activity described herein. Defendants engaged in, and their activities affected interstate commerce because it involved commercial activities across state lines, including national marketing campaigns, and the solicitation and receipt of money from victims located throughout the country.

95. All Defendants constitute an associated-in-fact enterprise in that they acted together with a common purpose of obtaining money from Plaintiffs and consumers in the state of California and the United States at large.

96. The "Scheme" begins with the GM Defendants with the authorization of the Allison Defendants, advertising their trucks, and more specifically, Defendants GM Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD as containing "Allison" transmissions, going so far as to installing an "Allison Transmission" badge on the vehicles, as well as advertising on the "Monroney" window sticker that the subject vehicles contain an "Allison" transmission when they do not. Based on their agreement, the GM Defendants, initiate commercials internet ads, newspaper ads, mailers and letters sent through the U.S. Mail featuring its trucks and their components to entice consumers to purchase the subject trucks, as well as further advertising through the GM Defendants' nationwide collective of "authorized" dealerships, while omitting the material fact that the subject trucks do not contain an "Allison" manufactured transmission. Included in the Defendants' scheme, is the GM Defendant's inclusion into the price of the subject trucks, the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty which is supposed to cover replacement of items included in the subject trucks, such as the alleged "Allison" transmission. Through this scheme, consumers are affected in at least four (4) different ways: (1) they pay a premium for Defendants' trucks that allegedly contain the "Allison" transmission though it does not; (2) they pay a premium for a product that they would never have purchased had they known the trucks did not actually contain the "Allison" manufactured transmission; (3) suffer a reduced value of the truck as a result of not actually having an "Allison" manufactured transmission; (4) they pay the GM Defendants directly for the GM Defendants' Manufacturer's Warranty or Manufacturer's Extended Warranty, that does not repair or replace the alleged "Allison" transmission with "Allison"

manufactured parts, or (5) pay the cost of repairs and/or replacement for the less superior GM Defendants' transmission. This Scheme is premised on the fraudulent misrepresentation and/or omissions by Defendants that its Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD contain "Allison" transmissions. The fraud continues with the GM Defendants through either direct or indirect sales to consumers both in California and the United States at large including with respect to the GM Defendants' Manufacturer's Warranty or Manufacturer's Extended Warranty. The Scheme provides increased sales for the GM Defendants as a result of advertising the subject vehicles containing "Allison" transmissions and the resulting expense of the GM Defendants' Manufacturer's Warranty or Manufacturer's Extended Warranty.

97. The "Scheme" is furthered as a result of the Plaintiffs and consumers being forced to purchase the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty considering that such warranty does not replace or repair the alleged "Allison" transmission with actual an "Allison" transmission or "Allison" parts. The result of the activities of the enterprise working together is to effectuate the common purpose of deceiving the consumer into purchasing the GM Defendants trucks at an increased premium, its warranties, all the while not providing the products and/or services as advertised. In essence, the Defendants sought to defraud Plaintiffs and consumers at large through misrepresentations and omissions into believing that the subject trucks contained and actual "Allison" manufactured transmission, solely for the purpose of selling the truck and their Manufacturer Warranty that does not replace the alleged "Allison" transmission with a new one, or replace such parts as necessary with "Allison" parts.

98. Part of the "Scheme, includes the GM Defendants being able to include the cost of its manufacturer's warranty in the purchase price of the subject trucks, or caused Plaintiffs and/or consumers to purchase extended warranties, which covered

the subject trucks, including but not limited to the alleged "Allison" transmissions. The inclusion of the Manufacturer's Warranty is a direct purchase between the Plaintiffs and/or consumers and the GM Defendants, as the GM Defendants' Manufacturer's Warranty is owned by the GM Defendant and provider of the factory warranty, which is tied to the vehicle. Plaintiffs and consumers are the direct purchasers of the GM Defendants' Manufacturer's Warranty.

99. This conduct occurred consistently throughout the United States from at least four years preceding the filing of the Complaint in this matter and continues to occur. Complaints by consumers from around the country establish the continuous nature of the enterprise until at least December 2025, though the "Scheme would appear to be ongoing an continuing with respect to the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty as the Plaintiffs and consumers' paid for a product that does not represent what was advertised. Plaintiffs are informed and believe the Defendants collected tens of millions of dollars as a result of the Scheme. Therefore, the Scheme has been continuous and perpetuated by Defendants for many years and Plaintiffs are informed and believe it is continuing to date, to the extent that prior to December 2025, the Defendants have not informed purchasers of the GM Defendants Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD do not contain an actual "Allison" manufactured transmission, nor has the Defendants refunded or discounted the costs of its Manufacturer's Warranty and/or Extended Manufacturer's Warranty considering the subject trucks do not contain an "Allison" manufactured transmission.

100. Defendants were knowingly and willing participants in the Scheme, and reaped revenues and/or profits therefrom. Plaintiffs' assertion that Defendants engaged in this fraudulent Scheme is buoyed by the fact that up until around 2019 or 2020, the Defendants did in fact install actual "Allison" manufactured

transmissions, as advertised and sold on the subject trucks and their Manufacturer's Warranty and/or Extended Manufacturer's Warranty was based on the same.

101. Defendants knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). Specifically, Defendants acting collectively engaged in activity constituting a violation of 18 U.S.C. §§1341 (mail fraud) and 1343 (wire fraud), the predicate acts. The racketeering activity was made possible by the manufacturing, advertising, intentional omissionsand sale of the GM Defendants Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD as containing "Allison" transmissions and their accompanying Manufacturer's Warranty and/or Extended Manufacturer's Warranty.

102. Defendants committed multiple "Racketeering Acts," as described herein, including aiding and abetting such acts.

103. The Racketeering Acts were not isolated but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission.

104. In devising and executing the Scheme, Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343, in that they devised and knowingly carried out a material scheme or artifice to defraud or to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the Scheme, Defendants committed these Racketeering Acts, intentionally and knowingly, with the specific intent to advance the Scheme.

105. Other methods and means that GM Defendants used to execute and perpetrate the Scheme include, but are not limited to, providing directly and/or indirectly marketing material to its "independent" authorized dealer network across the country for purposes of advertising and selling its trucks and warranties.

106. As a result of their Scheme, Plaintiffs and the general consumer spent tens of thousands of dollars in purchasing the subject trucks that do not contain an actual “Allison” manufactured transmission as well as on the GM Defendants’ Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty which is included in the price of the truck (cost of warranty is paid directly to te GM Defendants). The Plaintiffs and consumers then enter into purchase contracts which contain financing either directly or indirectly with the GM Defendants, which then causes Plaintiffs to utilize wires and/or money transfers for downpayments on the subject trucks and warranties as well as for the monthly payments to Defendants for the purchase of the subject truck as well as for the purchase of warranties.

107. Other methods and means that Allison Defendants used to execute and perpetuate the Scheme include, but are not limited to, allowing the GM Defendants to utilize their name to sell their vehicles to the average consumer with non-“Allison” manufactured transmissions solely for the purpose of helping the GM Defendants “validate and market their own transmissions.”

108. Defendants used mail, television, cable, newspapers and other mediums to create and perpetuate the Scheme through virtually identical misrepresentations, concealments and material omissions, whereby they reaped millions and millions of dollars from the Plaintiffs and consumers at large.

109. Defendants’ fraudulent use of the mail and wires included direct mailers, newspapers, as well as internet communications sent by Defendants to Plaintiffs, consumers, and third parties via U.S. Mail, commercial carrier or other interstate electronic media, as well as the use of banking systems to obtain payment for the subject vehicles:

110. Throughout the relevant time period, including on or about the dates set forth below, the Defendants caused to be delivered by mail or by a commercial interstate carrier, with knowledge of each other, listing Defendants trucks as containing “Allison” transmissions and representing and selling them as containing

"Allison" transmissions.

111. Through the fraudulent scheme, and specifically, falsely advertising the GM Defendants' trucks as having an "Allison" transmission, knowing that the trucks do not actually contain an "Allison" transmission, and then providing Plaintiffs and consumers with their warranties that does not provide for the repair and or replacement of an "Allison" manufactured transmission, and then causing Plaintiffs' and consumers alike to believe that the truck in fact contained an "Allison" transmission and/or that such transmission is under warrany, thus causing them to spend tens of thousands of dollars purchasing the GM Defendants' trucks and Manufacturer Warranty under the false pretense that it contained an "Allison" transmission.

## CLASS ALLEGATIONS

112. This action is brought and may properly proceed as a class action, pursuant to the provisions of Rule 3.765 of the California Rules of Court.

113. Plaintiffs seek certification of a Class and Subclasses pursuant to California Civil Code of Procedure § 382, which is composed of and defined as follows:

a. **CLASS:** All consumers who resides in any state in the United States except California who, at any time on or after the day four years prior to the date on which this Complaint is filed, were solicited by Defendants, jointly and/or severally, to purchase GM Defendants Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD which allegedly contained an "Allison" transmission, and who (a) purchased such vehicle; (b) subsequently learned that the truck did not actually contain an "Allison" manufactured Transmission; and (c) purchase included a GM Manufacturer's Warranty or GM Manufacturer's Extended Warranty.

b. **CALIFORNIA SUB-CLASS:** All consumers who resides in the state of California who, at any time on or after the day four years prior to the date on which this Complaint is filed, were solicited by

Defendants, jointly and/or severally, to purchase GM Defendants Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD which allegedly contained an "Allison" transmission, and who (a) purchased such vehicle,(b) subsequently learned that the truck did not actually contain an "Allison" manufactured Transmission; (c) suffered monetary damages as a result of problems arising with the non "Allison" manufactured transmission; (d) purchase included a GM Manufacturer's Warranty or GM Manufacturer's Extended Warranty; and (e) whose transmission required service and/or replacement under the GM Manufacturer's Warranty or GM Manufacturer's Extended Warranty and did not receive an "Allison" manufactured transmission replacement or "Allison" manufactured replacement parts for the alleged "Allison" transmission in the subject vehicles.

c. **NATIONWIDE SUBCLASS:** All consumers who resides in any state in the United States except for California, who, at any time on or after the day four years prior to the date on which this Complaint is filed, were solicited by Defendants, jointly and/or severally, to purchase GM Defendants Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD which allegedly contained an "Allison" transmission, and who (a) purchased such vehicle; (b) subsequently learned that the truck did not actually contain an "Allison" manufactured Transmission; (c) have suffered monetary damages as a result of problems arising with the non "Allison" manufactured transmission, and (d) whose transmission required service and/or replacement under the GM Manufacturer's Warranty or GM Manufacturer's Extended Warranty and did not receive an "Allison" manufactured transmission replacement or "Allison" manufactured replacement parts for the alleged "Allison" transmission in the subject vehicles

114. The members of the Class and Subclasses, for whose benefit this action is brought are so numerous that joinder of all members is impracticable.

///

115. There are questions of law and fact common to the members of the Class and Subclasses that predominate over questions affecting only individuals. These common questions include:

A. Whether Defendants' actions, as set forth herein, were unconscionable commercial practices, deception, fraud, false pretenses, and/or misrepresentations in violation of the UCL;

B. Whether the targeting consumers, such as Plaintiffs, by Defendants constitutes an unconscionable business practice which violates the UCL;

C. Whether Plaintiffs and the members of the Class and/or Subclasses suffered an ascertainable loss as a result of Defendants' violation(s) of the UCL;

D. Whether Defendants' actions constituted a violation of RICO;

E. Whether Defendants engaged in "racketeering activities";

F. Whether Plaintiffs and the members of the Class and/or Subclasses suffered damages as a result of Defendants' violation(s) of RICO;

G. What relief are Plaintiffs and the members of the Class and/or Subclasses entitled to under the UCL and RICO;

H. Whether Defendants' actions, as set forth herein constitutes fraud by an intentional misrepresentation;

I. Whether Defendants' actions, as set forth herein constitutes fraud by concealment;

J. Whether Defendants' actions, as set forth herein constitutes fraud by a negligent misrepresentation;

K. Whether Defendants' actions, as set forth herein constitutes fraud by an negligence;

L. Whether Defendants' actions, as set forth herein constitutes a violation of the Breach of Express Warranty- Uniform Commercial Code, U.C.C.§ 2-313 (1);

M. Whether Defendants' actions, as set forth herein constitute a violation of the Breach of Implied Warranty- Uniform Commercial Code, U.C.C.§ 2-314 (1);

N. Whether the GM Defendants' actions, as set forth herein, constitute a violation of the California Consumer Legal Remedies Act, C.C.P.§1780 et. seq.; and

O. Whether the GM Defendants' actions, as set forth herein constitute Violation of other States Consumer Fraud.

116. Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses which they seek to represent because all such claims arise out of the same policies, practices, and conduct, and the same or similar documents used by Defendants in their dealings with Plaintiffs.

117. Plaintiffs have no interests antagonistic to those of the Class and Subclasses.

118. The Class and Subclasses, of which Plaintiffs are members, are readily identifiable.

119. Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses and have retained competent counsel experienced in the prosecution of consumer litigation. Proposed Class Counsel has investigated and identified potential claims in the action. Proposed Class Counsel has a great deal of experience in handling class actions, other complex litigation, and claims of the type asserted in this action.

120. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. While the economic damages suffered by the individual members of

the Class and Subclasses are significant, the amount is modest compared to the expense and burden of individual litigation.

121. The questions of law or fact common to the members of the Class and Subclasses predominate over any questions affecting only individual members.

122. The prosecution of separate actions by individual members of the Class and Subclasses would run the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the Defendants in this action, or the prosecution of separate actions by individual members of the Class and Subclasses would create the risk that adjudications with respect to individual members of the Class and Subclasses would as a practical matter be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests. Prosecution as a class action will eliminate the possibility of repetitious litigation.

123. Defendants have acted, or refused to act, on grounds generally applicable to Plaintiffs and all class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class and Subclasses as a whole.

124. A class action will cause an orderly and expeditious administration of the claims of the Class and Subclasses, and will foster economies of time, effort and expense.

125. Plaintiffs do not anticipate any difficulty in the management of this litigation.

///

///

///

///

///

///

## FIRST COUNT

**(Unfair Competition Law- Business and Professions Code § 17200)**

**Plaintiff Erik Hall, David Pages and California Sub-Class Against All Defendants**

126. Plaintiffs Hall and Pages re-assert and incorporate by reference each and every allegation set forth in the preceding paragraphs as though set forth at length herein.

127. California Business and Professions Code § 17200 et seq. (also referred to herein as the "Unfair Business Practices Act" or "Unfair Competition Law") prohibits unfair competition in the form of any unlawful, unfair or fraudulent business act or practice.

128. Plaintiffs are "persons" within the meaning of California Business and Professions Code § 17204 which allows "any person who has suffered injury in fact and has lost money or property as a result of such unfair competition" to prosecute a civil action for violation of the Unfair Competition Law ("UCL").

129. Defendants, jointly and/or severally, engaged in unconscionable commercial practices, deception, fraud, false pretenses, racketeering activities and/or misrepresentations and violated the UCL by 1) Advertising its trucks as having an "Allison" transmission though it does not; (2) charging a premium for a product that does not actually contain the "Allison" transmission; (3) charging Plaintiffs and consumers for a Manufacturer's Warranty and/or Extended Manufacturer's Warranty that does not provide for the replacement and/or repair of the alleged "Allison" transmission with "Allison" manufactured parts; (4) failing to inform the Plaintiffs and consumers that its trucks does not contain an "Allison" manufactured transmission and/or that the warranty does not provide for actual "Allison" manufactured replacement parts; or (5) failing to pay the cost of repairs and/or replacement for the less superior GM transmission. Plaintiff Hall contends the herein alleged constitutes a violation of RICO as well as the California Legal

Remedies Act which constitutes and "unlawful" act under the UCL.

130. Defendants engaged in the same conduct in their transactions with consumers similarly-situated to Plaintiff Hall. Defendants manufactured, falsely advertised and sold GM Defendants' trucks as advertised with an "Allison" transmission, knowing that the trucks did not in fact contain an "Allison" manufactured transmission as well as including in the sales price their Manufacturer's Warranty and/or Extended Manufacturer's Warranty that does not provide for repair or replacement of the alleged "Allison" transmission with "Allison" manufactured parts. In other circumstances, Defendants failed to notify consumers when their trucks needed service of the transmissions that they were not actually "Allison" manufactured transmissions.

131. Defendants especially targeted consumers who were either aware of "Allison" transmissions or wanted an "Allison" transmission in their truck due to the reputation of "Allison" transmissions. The targeting of consumers such as Plaintiff Hall by Defendants is itself an unconscionable business practice which violates the UCL.

132. By failing to provide Plaintiffs Hall, Pages and consumers with (or omitting) information alerting them to the fact the GM Defendants trucks did not contain "Allison" manufactured transmissions, and that their Manufacturer's Warranty and/or Extended Manufacturer's Warranty that does not provide for repair or replacement of the alleged "Allison" transmission with "Allison" manufactured parts Defendants caused Plaintiffs and consumers alike to pay a premium for the subject truck to their detriment. In other words, Plaintiffs and consumers would not have purchased the subject trucks as a premium, but for the fact that Defendants sought to conceal the true nature of the transmissions.

133. The violation of other statutes, particularly statutes that provide specific protection to consumers such as California CLRA, as well as the breach of warranty and breach of implied warranty, is evidence of and constitutes an unconscionable

commercial practice in violation of the UCL.

134. The failure by Defendants to comply with CLRA was in furtherance of their scheme to improperly advertise and sell its vehicles and reap the benefits of an increased premium for the purchase of such truck, including their Manufacturer's Warranty and/or Extended Manufacturer's Warranty. Defendants, jointly and/or severally, therefore engaged in unconscionable commercial practices, deception, fraud, false pretenses, and/or misrepresentations and violated § 17200 of the UCL.

135. Defendants engaged in the same conduct in their transactions with consumers similarly to Plaintiffs.

136. As the result of Defendants' violation of the UCL, Plaintiffs Hall and Pages have suffered an ascertainable loss, including but not limited to the cost of the subject vehicles in total, or the premium attached to the subject vehicle as shown in the "Monroney" window stickers and/or the cost of their Manufacturer's Warranty and/or Extended Manufacturer's Warranty.

137. As the result of Defendants' violations of the UCL, those similarly situated to Plaintiffs Hall and Pages also suffered ascertainable losses, including but not limited to the entire cost of purchasing the truck, as well as the costs associated with having to service the subject vehicles transmission.

138. Plaintiff Hall and Pages and all other similarly situated are thus entitled to all appropriate legal and equitable relief, an award of treble their ascertainable losses and damages, plus actual damages, attorney's fees, and costs pursuant to the Business and Professions Code.

## SECOND COUNT

**(Racketeer Influenced and Corrupt Organizations Act-18 U.S.C. § 1962)**

**Plaintiffs and the Class Against All Defendants**

139. Plaintiffs' re-assert and incorporate by reference each and every allegation set forth in the preceding paragraphs as though set forth at length herein.

140. RICO provides that "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

141. RICO also provides that "It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b).

142. RICO further provides that "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

143. RICO also provides that "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

144. At all relevant times, Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3), because they were legal entities capable of holding a legal or beneficial interest in property.

145. As set forth herein above Defendants' Scheme was to defraud by Defendants agreeing that beginning around January 2020, that the GM Defendants would be allowed to advertise its Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC

3500 HD trucks as having an "Allison" transmission as well as charging Plaintiffs and consumers by including the cost of their Manufacturer's Warranty and/or Extended Manufacturer's Warranty into the purchase price of the subject trucks. The Defendants collectively constitute an enterprise whose common purpose was to increase revenues to each Defendant. The GM Defendants, with the express authorization of the Allison Defendant manufactured its Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD trucks, which actually included the GM Defendants own manufactured transmissions, however, the Defendants agreement was that the GM Defendants could advertise the subject trucks as containing "Allison" transmissions, even going so far as to place an "Allison Transmission" badge on each truck, and stating that such trucks contained "Allison" transmissions on the "Monroney" window sticker. The Allison Defendants furthered the common purpose by knowingly allowing the GM Defendants to falsely advertise that the subject trucks included an "Allison" transmission, knowing that there was/is a premium attached to the "Allison" manufactured transmissions, as well as charging Plaintiffs and consumers at large for their Manufacturer's Warranty and/or Extended Manufacturer's Warranty which was included in the price of the subject vehicle, knowing that their Manufacturer's Warranty and/or Extended Manufacturer's Warranty would not provide the repair or replacement of the alleged "Allison" transmission. At no time did either of the Defendants believe that the subject trucks contained an "Allison" manufactured transmission, nor believed that the Manufacturer's Warranty and/or Extended Manufacturer's Warranty would repair or replace the alleged "Allison" transmission with actual "Allison" manufactured parts, but had an agreement to allow the GM Defendants to market the subject trucks in such a way as to have consumers believe that the trucks contained an "Allison" manufactured transmission and an appropriately accompanying Manufacturer's Warranty and/or Extended Manufacturer's Warranty.

146. Defendants have engaged in a pattern of racketeering activity, and therefore have violated 18 U.S.C. § 1962(a), by receiving income from unlawful and false advertising (including omissions) of the GM Defendants trucks, specifically, the Chevy Silverado 2500 HD, General Motors Chevy Silverado 3500 HD, General Motors GMC 2500 HD, and General Motors GMC 3500 HD during the years 2020 to 2025 as well as their Manufacturer's Warranty and/or Extended Manufacturer's Warranty.

a. **Mail Fraud:** Defendants violated 18 U.S.C. §1341, by sending or receiving or causing to be sent or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the Scheme, which amounts to a material scheme to defraud and obtain money on false pretenses, misrepresentations, and/or omissions. The materials include, but are not limited to, mailers, promotional materials and advertisements.

b. **Wire Fraud**: Defendants violated 18 U.S.C. §1343, by transmitting, receiving or causing to be transmitted or received materials and monies by wire for the purpose of executing the Scheme, which amounts to a material scheme to defraud and obtain money on false pretenses, misrepresentations and/or omissions. The materials transmitted and/or received include but are not limited to interstate credit cards or bank transactions, or emails to the target consumers.

147. Defendants violated 18 U.S.C. § 1962(b) by acquiring or maintaining, directly or indirectly, an interest in or control of enterprises which were engaged in trade or commerce, through a pattern of racketeering activity or through collection of an unlawful debt in the form purchase price of subject vehicles, increased purchase price due to the alleged inclusion of an "Allison" transmission, interest paid on subject vehicle loans, as well as the purchase of maintenance plans

(Manufacturer's Warranty and/or Extended Manufacturer's Warranty) for the vehicles, as well as repair costs associated with the faulty GM Defendants' manufactured transmission.

148. Defendants violated 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the conduct of the affairs of an enterprise engaged in trade or commerce through a pattern of racketeering activity increased purchase price of subject trucks (which included Manufacturer's Warranty and/or Extended Manufacturer's Warranty), interest paid on subject truck loans, as well as repair costs associated with the installed GM Defendants manufactured transmission.

149. Defendants violated 18 U.S.C. § 1962(d) by conspiring to engage in racketeering activity.

150. Defendants were used as a tool to carry out the scheme and pattern of racketeering activity.

151. Defendants, individually and jointly, as part of an enterprise agreed to commit more than two racketeering acts, with knowledge that the objective was unlawful and intended to further that unlawful objective. The multiple acts of racketeering activity that they committed and/or conspired to, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

152. Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) include wire fraud and mail fraud as described herein to perpetuate the Scheme of targeting and soliciting consumers to purchase the subject trucks by falsely advertising (or through omission) that the trucks contained "Allison" transmission and that the Manufacturer's Warranty and/or Extended Manufacturer's Warranty would repair or replace the alleged "Allison" transmission with actual "Allison" manufactured parts. The Scheme was agreed to by the Defendants, to increase revenue in the form of a "premium" price of the subject truck as a result of

allegedly containing “Allison” transmissions. The Scheme also subjected consumers to increased maintenance costs as a result of the installed GM Defendants’ manufactured transmissions.

153. Defendants’ predicate acts of racketeering amount to a material scheme to defraud and to obtain money on false pretenses, misrepresentations, promises, and/or omissions.

154. Defendants knowingly and intentionally made these misrepresentations, acts of concealment and failures to disclose. Defendants either knew or recklessly disregarded that these were material representations and omissions.

155. Plaintiffs and those similarly situated to have suffered harm and have been injured from Defendants' violations of RICO in the amount of the increased purchase price of subject truck (which included their nor believed that the Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty), interest paid on subject truck loans, as well as repair costs associated with the GM Defendants’ actual transmission. In the absence of Defendants’ violations of 18 U.S.C. § 1962, Plaintiffs and the Class would not have incurred these losses.

156. Plaintiffs’ and the Class’s injuries were directly and proximately caused by Defendants’ racketeering activity.

157. Defendants knew and intended that Plaintiffs and the Class would rely on the scheme’s fraudulent representations and omissions. Defendants knew and intended Plaintiffs, and the Class would pay monies to Defendants as a result of same.

158. Plaintiffs and all others similarly situated are thus entitled to all appropriate legal and equitable relief, an award of treble their damages, plus attorney's fees, and costs pursuant to 18 U.S.C. § 1964(c).

///

///

## THIRD COUNT

## (Fraud-Intentional Misrepresentation)

## Plaintiffs and the Class Against All Defendants

159. The allegations of paragraphs 1-158 are incorporated herein as though set forth in full.

160. The above conduct constitutes fraudulent and intentional misrepresentation.

161. Defendants represented to Plaintiffs that a fact was true, namely the inclusion of an "Allison" transmission in the subject trucks.

162. The GM Defendants published the following that was false and misleading:

163. "Representing through its manufacturing "Monroney" window sticker, that the subject trucks contained an "Allison" transmission," as well as placing an "Allison Transmission" badge on the subject trucks, including the purchase price of its Manufacturer's Warranty and/or Extended Manufacturer's Warranty (knowing that the Manufacturer's Warranty and/or Extended Manufacturer's Warranty would not repair or replace the alleged "Allison" transmission with actual "Allison" manufactured parts), online advertisement from one of the GM Defendants' "authorized" independent network dealerships, stating that the truck actually contained an "Allison" transmission." [See **Exhibit D**]

164. These advertisements constitute intentional misrepresentation.

165. The Allison Defendants are further liable herein, because they aided and abetted the GM Defendants in the fraudulent conduct. Allison Defendants aided and abetted the GM Defendants by allowing the GM Defendants to place an "Allison Transmission" badge on the GM Defendants trucks, knowing that the trucks did not actual contain an "Allison" manufactured transmission. Allison further aided and abetted the GM Defendants' conduct by engaging in a cover-up of the fact that the trucks did not contain an "Allison" manufactured transmission, and then attempting

to end and/or modify its partnership with the GM Defendants, when it learned of the issues of recalls with the GM Defendants' transmissions, and chose to stay silent about the trucks not containing an "Allison" manufactured transmission, and chose to not take corrective actions to rectify the falsity of the GM Defendants representations of an "Allison" transmission in the subject trucks.

166. The Allison Defendants aider and abettor conduct was intentional, and was done with the realization and knowledge that its partner, namely, the GM Defendants, would commit an intentional wrongdoing, including the RICO violations alleged herein; the false and misleading ads, the "Monroney" window sticker, the "Allison Transmission Badge," as alleged herein; the intentional misrepresentations alleged herein; the intentional concealments alleged herein.

167. These fraudulent ads and publications were issued by Defendants during the period of approximately 2020 through 2025; the ads were disseminated through the GM Defendants' nationwide network of authorized independent dealerships as well directly by GM.

168. Defendants' representations were false as they were NOT using including "Allison" manufactured transmissions in the subject trucks.

169. Defendants' representations were false as they knew that the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty would not replace or repair the alleged "Allison" transmissions in the subject trucks with "Allison" manufactured transmissions and/or parts.

170. Defendants knew that the representation that they were using "Allison" transmissions was false when the representation was made.

171. Defendant intended that Plaintiffs rely on the representation that they were using including "Allison" transmissions.

172. Plaintiffs reasonably relied on Defendants' representation in believing that actual "Allison" manufactured transmissions were being installed in the subject trucks.

173. Plaintiffs were harmed as set forth below.

174. Plaintiffs' reliance on Defendants' representation that "Allison" transmissions were being used in the subject trucks was a substantial factor in causing their harm.

175. Had Plaintiffs known the true facts that "Allison" manufactured transmissions were not actually installed in the subject trucks, Plaintiffs would not have purchased subject trucks or paid a "premium" for such trucks.

**A. Damages**

176. As a proximate result of Defendants' conduct, Plaintiffs suffered actual damages. Damages are requested equal to the full amount charged to class members who paid for the subject truck and/or a premium for an "Allison" transmission, but did not receive an "Allison" manufactured transmission as well as the cost for the associated Manufacturer's Warranty and/or Extended Manufacturer's Warranty; Plaintiffs request consequential damages equal to the value of the impact of the use of the GM Defendants transmissions on the claimants trucks, including an impact whereby their trucks needed irregularly high levels of transmission repairs, and for some Plaintiffs, caused them to purchase a new truck from a different manufacturer. Plaintiff requests all consequential damages, however suffered.

177. The complaint also requests punitive damages against all Defendants based on willful, oppressive and fraudulent behavior.

178. A combination of the failure to include an "Allison" manufactured transmission, instead of a "GM" manufactured transmission, as week as the included Manufacturer's Warranty and/or Extended Manufacturer's Warranty created a need to have irregularly high levels of repair issues. Some of the class members responded to the higher levels of repairs as being a reason to choose to purchase a new truck rather than suffer on with their current one. One of the further benefits received by Defendants, is that this failure to include an "Allison" manufactured transmission caused some victims to choose to buy a new truck. Plaintiffs assert as a further

component of damages, and as a further proximate result of the "Allison" transmission fraud, damages incurred due to the need to buy a new truck, in an amount according to proof.

179. The entire service costs of the transmission by the GM Defendants' "authorized" network of independent dealerships is estimated to be approximately eight thousand six hundred fourteen dollars ($8,614.00); In 2024 alone, apparently four hundred sixty-one thousand eight hundred thirty-nine (461,839) trucks were affected due to a transmission control issue[3], thus, four hundred sixty-one thousand eight hundred thirty-nine (461,839) multiplied by eight thousand six hundred fourteen dollars ($8,614.00) equals a total damage figure of three billion nine hundred seventy-eight million two hundred eighty-one thousand one hundred forty-six dollars ($3,978,281,146.00.)

180. It is likely that the four hundred sixty-one thousand eight hundred thirty-nine (461,839) transmission failures represent four hundred sixty-one thousand eight hundred thirty-nine (461,839) different victims.

181. Plaintiffs do not have the breakdown of these allegations, but states that with four hundred sixty-one thousand eight hundred thirty-nine (461,839) instances of transmission issues, the Scheme potentially invoices tens of thousands of victims.

182. Similarly, the four hundred sixty-one thousand eight hundred thirty-nine (461,839) incidents of transmission control failure suggests that the three billion nine hundred seventy-eight million two hundred eighty-one thousand one hundred forty-six dollars ($3,978,281,146.00.) does not constitute the entire amount the GM Defendant would be liable for both labor and the parts.

183. The Plaintiffs' claim damages for the entire amount for the repair service and/or replacement for each incidence of use of a non- "Allison" transmission by the Defendants. In the example of a transmission replacement, the

[3] The issue is believed to be with the GM Defendant's manufactured transmissions and not an "Allison" manufactured transmission.

entire service costs approximately eight thousand six hundred fourteen dollars ($8,614.00).

184. Plaintiffs claim for service amount and parts amount and total amount as damages herein.

185. This claim for the entire amount is based on the fact that Plaintiffs did not receive substantially what they bargained for; they purchased GM trucks that allegedly had an “Allison” transmission, instead, they received a GM manufactured transmission.

186. In the alternative, Plaintiffs request for some other amount of damages and damage calculations that the court deems just and appropriate is on the basis that they paid for something that they did not receive. Their purchase required “Allison” manufactured transmissions (as advertised), and Plaintiffs and class member have also suffered compensatory and general damages to their trucks, arising from the fact that the trucks contain GM manufactured transmissions, purchased Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty as they were included in the price of the subject trucks, as described in this complaint negatively impact the trucks owned by Plaintiffs herein.

187. Plaintiffs also seek exemplary damages against Defendants based on the fact that Defendants had actual knowledge of the fraudulent Scheme and chose to assist in covering it up and remaining quiet to the many customers of the GM Defendants. The Defendants conduct, in this regard, constitute fraudulent and oppressive conduct, and aided and abetted each other’s, oppressive and malicious conduct. Exemplary damages are requested in an amount according to proof.

188. Had either Defendant done the right thing, and included an actual “Allison” manufactured transmission, the Plaintiffs would have received their full benefit of the bargain thereby.

189. Plaintiffs thus request full damages against Defendants for directly participating in the false advertising and directly participating in the Scheme.

190. Plaintiffs herewith seek the following other relief:

191. Unless and until injunctive relief is issued by the court, Defendants will continue in their conduct, i.e., not replacing the GM manufactured transmissions with an "Allison" manufactured transmission and/or providing Manufacturer's Warranty and/or Extended Manufacturer's Warranties that provide for the parts as advertised by the Defendants. Plaintiffs accordingly request injunctive relief in the form of an order enjoining and prohibiting the Defendants from using an enterprise to commit acts of mail fraud and wire fraud, and such other injunctive relief as the Court deems just and appropriate. Specifically, Plaintiffs request an injunction prohibiting Defendants from advertising that the subject trucks contain and/or contains an "Allison" transmission.

192. For Defendants to provide an accounting of all profits earned as a result of their mutual transactions.

193. A combination of the use of non- "Allison" manufactured transmissions, including the use of Defendant GM's transmissions, created a need to have irregularly high levels of repair issues. Some of the class members likely responded to the higher levels of repairs as being a reason to choose to purchase a new truck rather than suffer on with their current one. One of the further benefits received by Defendants, is that this use of non- "Allison" manufactured transmissions caused victims to choose to buy the subject trucks from the GM Defendant. Plaintiffs assert as a component of damages, as a further proximate result of this "Allison" transmission fraud, damages incurred due to the need to buy a new truck, in an amount according to proof.

194. Plaintiffs further seek such other relief as the Court deems just and appropriate.

195. WHEREFORE Plaintiffs Pray for relief as set forth below in the Prayer for Relief.

///

**FOURTH COUNT**

**(Fraud-Concealment)**

**Plaintiffs and the Class Against All Defendants**

196. The allegations of paragraphs 1-195 above are incorporated herein as though set forth in full.

197. Plaintiffs assert this third claim for relief on for fraud based on intentional concealment against Defendants.

198. Defendants undertook significant efforts to conceal these facts:

199. Defendants concealed the "Allison" transmission fraud. The fact that Defendants falsely advertised that the subject trucks contained "Allison" transmissions came to light in or around December 2025, when it was announced that the Defendants were ending and/or modifying their partnership deal, and that GM would no longer be allowed to use the "Allison" badge when marketing the subject trucks.

200. Plaintiffs trusted the Defendants to actually install and/or include an "Allison" manufactured transmission and are not personally involved in the manufacturing process to examine what parts are being used. The "Monroney" window stickers issued by the GM Defendants in this action reflects the inclusion of an "Allison" transmission.

201. Plaintiffs had no way of knowing non "Allison" manufactured transmissions were actually being installed in the subject trucks.

202. Plaintiffs also had no way of knowing that the they were paying for a Manufacturer's Warranty and/or Extended Manufacturer's Warranty that does not provide for repair or replacement of parts of the subject vehicle as advertised.

203. Plaintiffs learned on-line about Defendants fraudulent Scheme.

204. Plaintiff Magana learned of the fraud on approximately on or about November 2025 online.

205. Plaintiff Brandt learned of fraud on approximately on or about

November 2025 online.

206. Plaintiff Tanner learned of fraud on approximately on or about November 2025 online.

207. The GM Defendants by and through their "authorized" network of independent dealerships published the following ad that were false and misleading:

208. "And more good news: Chevy's smooth 10-speed Allison transmission is now standard for both the new 6.6L turbo diesel as well as the 6.6L gas engine. The 10-speed Allison was created to handle the heavy tasks of supporting the HD's engines. If you want high torque, the 10-speed Allison Transmission delivers without a second thought." [See **Exhibit D**, page 1]; "As mentioned, the Chevy Allison 10-Speed now comes standard with both HD engine." [See **Exhibit D**, page 2]; "And now that the 6.6L gas engine comes standard with Chevy's noteworthy 10-speed Allison automatic transmission, nothing is stopping the HD series from getting the job done." [See **Exhibit D**, page 3].

209. The GM Defendants "authorized" network of independent dealerships knowingly or unknowingly, published such ads that were false and misleading based on the Defendants' Scheme.

210. A further false and misleading advertisement published by Allison Transmission on or about December 4, 2018, is in the form of a letter, which states [**Exhibit E**,] and states:

> "“We built the new 2020 Silverado HD with more differentiation than ever before, to meet the needs and priorities of our customers," said Jaclyn McQuaid, chief engineer, Silverado HD. "By offering the new Allison 10-speed, tested and validated in partnership with Allison Transmission, each transmission will deliver the legendary quality and durability that customers have come to expect.
>
> The Allison branded automatic transmission, manufactured by General Motors combines enhanced performance and fuel economy,

Greater operational flexibility, and improved driver comfort and control, with an industry-leading reputation for uptime and reliability. Designed for high-performance and low-maintenance, the Allison 10-speed coupled with Chevrolet's Duramax diesel engines provide the superior power delivery and productivity customers' demand.

"We are pleased that General Motors continues to expand the range of Allison products available for their customers with the 2020 Silverado HD," said Randy Kirk, senior vice president Product Engineering and Program Management, Allison Transmission. "Allison Transmission and GM have a long history of collaboration and innovation. Recently, Allison Transmission announced production of the 6-speed fully automatic transmission, designed for Chevrolet's Silverado 4500 HD, 5500 HD and 6500 HD medium-duty trucks."

The 6-speed fully automatic transmission, manufactured by Allison Transmission, is the exclusive, commercial-duty transmission for Silverado chassis cab medium-duty commercial trucks.

"General Motors and Allison Transmission engineers have worked closely to provide optimal integration and help drive Chevrolet's hardest-working trucks since the 1950s. As a company, we are dedicated to engineering and manufacturing the most productive and reliable transmissions that improve the way our customers work," said John Coll, senior vice president Global Marketing, Sales and Service, Allison Transmission.

An exemplar of the Allison letter is attached hereto as **Exhibit E**.

211. These ads/publications constitute an intentional concealment of facts.

212. Defendants actively concealed the important facts from Plaintiffs that non "Allison" manufactured transmissions would be installed in the subject trucks and would be advertised and invoiced as "Allison" transmissions.

213. Manufacturers are in a position of trust with their customers, because what goes on at their manufacturing plants is unknown to consumers, who must trust the manufacturers to do the right thing and tell the truth about their products.

214. Thus, Defendants had a duty to disclose the use of non "Allison" manufactured transmissions int the subject trucks. This duty would arise at any point when the Defendant's learned that they actively concealed these material facts.

215. Defendants actively concealed the fact that the subject vehicles did not have an actual "Allison" manufactured transmission, but instead a GM manufactured transmission with "Allison" branding, as shown in the Allison document, **Exhibit E** hereto [quoted above].

216. At a minimum, Defendants did know as of the date of its advertisement [**Exhibit E**] and had a duty to come forward and advise the many customers of the GM Defendants that non "Allison" manufactured transmissions were installed instead of an actual "Allison" manufactured transmission in the subject trucks. Instead, Defendants remained silent and allowed the fraudulent Scheme to continue; and allowed the negative impact of the use of the non "Allison" manufactured transmission to linger in the owners' trucks and caused continually worsening damage.

217. It's akin to a builder not telling a client that the foundation is sinking only to have the house collapse. Indeed, one of the end goals of the "Allison" transmission Scheme, was to have customers purchase the GM Defendants trucks.

218. Plaintiffs did not know of the concealed facts that non "Allison" manufactured transmissions were installed instead of an actual "Allison" manufactured transmission in the subject trucks.

219. Plaintiffs did not know of the concealed facts that non "Allison" manufactured transmissions would be installed in the subject vehicle instead of an actual "Allison" manufactured transmission in the subject trucks where a repair or replacement was necessary to be performed under the GM Defendants'

Manufacturer's Warranty and/or Extended Manufacturer's Warranty.

220. Defendants intended to deceive Plaintiffs and consumers at large by concealing the fact that non "Allison" manufactured transmissions were installed instead of an actual "Allison" transmission in the subject trucks.

221. Plaintiffs reasonably relied on Defendants' deception.

222. Plaintiffs were harmed as set forth below.

223. Defendants' concealment of the fact that they were installing non "Allison" transmissions instead of an actual "Allison" manufactured transmission in the subject trucks was a substantial factor in causing Plaintiffs' harm as well as the fact that the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty would not provide for proper replacement specific parts as included in the subject trucks.

224. That Defendants intentionally failed to disclose that they were NOT using "Allison" manufactured transmission to Plaintiffs.

225. Had Plaintiffs known the true facts that Defendants did not install an actual "Allison" manufactured transmission, Plaintiffs would not have bought the subject trucks or paid a premium for the trucks.

226. The Defendants are further liable herein, because they aided and abetted each other's fraudulent conduct. The Defendants entered into a Scheme (agreement/partnership) whereby they agreed that the GM Defendants would manufacturer its own transmissions but would brand the transmissions as "Allison" transmissions without informing Plaintiffs and consumers, which were done through news releases and advertisements.

227. The Defendants further aided and abetted each other's conduct by engaging in a cover-up of the fraud, when problems began to arise with the GM "manufactured" transmissions that was branded as "Allison" transmissions by either terminating and/or modifying their partnership and requiring the GM Defendants to remove all references to "Allison" transmissions from its vehicles beginning in 2026.

228. The Allison Defendants' aider and abettor conduct was intentional and was done with the realization and knowledge that partner, namely the GM Defendants, would commit an intentional wrongdoing, including the RICO violations alleged herein; the false and misleading ads alleged herein; the intentional misrepresentations alleged herein; the intentional concealments alleged herein.

**A. Damages**

229. As a proximate result of Defendants' conduct, Plaintiffs suffered actual damages. Damages are requested equal to the full amount charged to class members who received non-"Allison" manufactured transmission, but were invoiced and paid a premium for an Allison" manufactured transmission; paid a premium for the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty that was included in the purchase price of the subject trucks; Plaintiffs request consequential damages equal to the value of the impact of the use of non-"Allison" manufactured transmission installed in the subject trucks, including an impact whereby their trucks needed irregularly high levels of transmission repairs, and for some Plaintiffs, caused them to purchase a new truck from a different manufacturer. Plaintiffs' request all consequential damages, however suffered.

230. The complaint also requests punitive damages against all Defendants based on willful, oppressive and fraudulent behavior.

231. A combination of the failure to include an "Allison" manufactured transmission, instead of GM" manufactured transmissions, and charging (included in the purchase price) Plaintiffs and consumers for the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty which does conform to what was advertised with respect to the subject trucks, created a need to have irregularly high levels of repair issues. Some of the class members responded to the higher levels of repairs as being a reason to choose to purchase a new truck rather than suffer on with their current one. One of the further benefits received by GM and Allison, is that this failure to include an "Allison" manufactured

transmission caused victims to choose to buy a new truck. Plaintiffs assert as a further component of damages, and as a further proximate result of the "Allison" transmission fraud Scheme, damages incurred due to the need to buy a new truck, in an amount according to proof.

232. The entire service costs of the transmission by the GM Defendants' network of authorized independent dealerships are approximately eight thousand six hundred fourteen dollars ($8,614.00). In 2024 alone, apparently four hundred sixty-one thousand eight hundred thirty-nine (461,839) trucks were affected due to a transmission control issue, thus, four hundred sixty-one thousand eight hundred thirty-nine (461,839) multiplied by eight thousand six hundred fourteen dollars ($8,614.00) equals a total damage figure of three billion nine hundred seventy-eight million two hundred eighty-one thousand one hundred forty-six dollars ($3,978,281,146.00.)

233. It is likely that the four hundred sixty-one thousand eight hundred thirty-nine (461,839) transmission failures represent four hundred sixty-one thousand eight hundred thirty-nine (461,839) different victims.

234. Plaintiffs do not have the breakdown of these allegations, but states that with four hundred sixty-one thousand eight hundred thirty-nine (461,839) fraud involving tens of thousands of victims.

235. Similarly, the four hundred sixty-one thousand eight hundred thirty-nine (461,839) incidents of fraud as a result of Defendants' Scheme, i.e., installing GM Manufactured transmissions which led to control failure suggests that the three billion nine hundred seventy-eight million two hundred eighty-one thousand one hundred forty-six dollars ($3,978,281,146.00.) does not constitute the entire amount the GM Defendants would be liable for both labor and the parts.

236. The Plaintiffs claim damages for the entire amount for the repair service for each incidence of use of non-Allison transmissions by the Defendants. In the example of a transmission replacement, the entire service costs approximately eight

thousand six hundred fourteen dollars ($8,614.00).

237. Plaintiffs claim for service amount and parts amount and total amount as damages herein.

238. This claim for the entire amount is based on the fact that Plaintiffs did not receive what they bargained for; they purchased GM trucks that allegedly contained an "Allison" transmission, but instead, they received a GM manufactured transmission.

239. In the alternative, Plaintiffs request for some other amount of damages and damage calculations that the court deems just and appropriate is on the basis that they paid for something that they did not receive, namely, "Allison" manufactured transmissions, and Plaintiffs and class member have also suffered compensatory and general damages, arising from the fact that their trucks contained GM manufactured transmissions, as described in this complaint which negatively impact the GM trucks owned by Plaintiffs herein.

240. Plaintiffs also seek exemplary damages against Defendants based on the fact that Defendants had actual knowledge of the fraudulent scheme and chose to assist in covering it up and remaining quiet to the many customers of the GM Defendants. The Defendants conduct, in this regard, constitute fraudulent and oppressive conduct, and aided and abetted each other's, oppressive and malicious conduct. Exemplary damages are requested in an amount according to proof.

241. Had either Defendant done the right thing, and included an actual "Allison" manufactured transmission, the Plaintiffs would have received the full expectation of their purchase.

242. Plaintiffs thus request full damages against Defendants for directly participating in the false advertising and directly participating in the transmission fraud.

243. Plaintiffs herewith seek the following other relief:

244. Unless and until injunctive relief is issued by the court, Defendants will

continue in their conduct, i.e., not replacing the transmissions with an "Allison" transmission. Plaintiffs accordingly request injunctive relief in the form of an order enjoining and prohibiting the Defendants from using an enterprise to commit acts of mail fraud and wire fraud, and such other injunctive relief as the Court deems just and appropriate. Specifically, Plaintiffs request an injunction prohibiting Defendants from advertising that the subject trucks contain and/or contains an "Allison" transmission and/or requiring Defendants from omitting that its Manufacturer's Warranty and/or Extended Manufacturer's Warranty will not provide "Allison" manufactured replacement parts for the subject trucks.

245. For Defendants to provide an accounting of all profits earned as a result of their mutual transactions.

246. A combination of the use of non-"Allison" manufactured transmissions, including the use of Defendant GM's manufactured transmissions, created a need to have irregularly high levels of repair issues. Some of the class members likely responded to the higher levels of repairs as being a reason to choose to purchase a new truck rather than suffer on with their current one. One of the further benefits received by Defendants is that the Scheme caused victims to choose to buy the subject trucks from the GM Defendants. Plaintiffs assert as a component of damages, as a further proximate result of this "Allison" transmission fraud, damages incurred due to the need to buy a new truck, in an amount according to proof.

**FIFTH COUNT**

**(Intentional Misrepresentation)**

**Plaintiffs and California Sub-Class Against All Defendants**

247. The allegations of paragraphs 1-246 are incorporated herein as though set forth in full.

248. Plaintiffs assert this claim for relief for fraud based on intentional misrepresentation against Defendants.

249. The above conduct constitutes fraudulent and intentional

misrepresentation.

250. Defendants represented to Plaintiffs that a fact was true, namely the inclusion of an "Allison" transmission in the subject trucks.

251. Defendants represented and/or omitted facts to Plaintiffs for the purpose of misleading the Plaintiffs into believing certain things are true, namely that its Manufacturer's Warranty and/or Extended Manufacturer's Warranty would provide "Allison" manufactured replacement parts for the subject trucks.

252. The GM Defendants published the following that were false and misleading:

253. "Representing through its manufacturing "Monroney" window stickers, that the subject trucks contained an "Allison" transmission;" online advertisement from one of the GM Defendants' "authorized" network of independent dealerships stating that the truck contained an "Allison" transmission," and as well as placing an "Allison Transmission" badge on the subject vehicles." [See **Exhibit A, B and C,** respectively]

254. These advertisements constitute a false and misleading negligent misrepresentation of fact.

255. The Allison Defendants are further liable herein, because they aided and abetted the GM Defendants in the fraudulent conduct. Allison Defendants aided and abetted the GM Defendants by allowing the GM Defendants to place an "Allison Transmission" badge on the GM Defendants trucks, knowing that the trucks did not actually contain an "Allison" manufactured transmission. Allison further aided and abetted the GM Defendants' conduct by engaging in a cover-up of the fact that the trucks did not contain an "Allison" manufactured transmission, and then attempting to end and/or modify the Scheme with the GM Defendants, when it learned of the issues of recalls with the GM Defendants transmissions, and chose to stay silent about it, and chose to not take corrective actions about it.

256. The Allison Defendants aider and abettor conduct was intentional, and

was done with the realization and knowledge that its partner, namely, the GM Defendants, would commit an intentional wrongdoing, including the RICO violations alleged herein; the false and misleading ads, the "Monroney" window sticker, the "Allison Transmission Badge," as alleged herein; the intentional misrepresentations alleged herein; the intentional concealments alleged herein.

257. These fraudulent ads and publications were issued by Defendants during the period of approximately 2020 through 2025; the ads were disseminated through the GM Defendants' “authorized” network of independent dealerships as well directly by GM Defendants.

258. Defendants' representation was false as they were NOT installing "Allison" manufactured transmissions in the subject vehicles.

259. Defendants knew that the representation that they were installing "Allison" transmissions in the subject trucks was false when they made it.

260. Defendant intended that Plaintiffs rely on the representation that they were installing "Allison" transmissions in the subject trucks.

261. Defendants whether through misleading representations or omissions, knew that their representation of their Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty would not provide “Allison” manufactured replacement parts for the subject trucks.

262. Plaintiffs reasonably relied on Defendants' representation that "Allison" transmissions were being installed and invoiced for such transmissions.

263. Plaintiffs reasonably relied on Defendants' misleading representations or omissions, that their Manufacturer’s Warranty and/or Extended Manufacturer’s Warranty would provide “Allison” manufactured replacement parts for the subject trucks.

264. Plaintiffs were harmed as set forth below.

265. Plaintiffs' reliance on Defendants' representation that "Allison" transmissions were being installed in the subject trucks was a substantial factor in

causing their harm.

266. Had Plaintiffs known the true facts that "Allison" manufactured transmissions were not actually installed in the subject trucks, and that the GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty would not provide "Allison" manufactured replacement parts for the subject trucks, Plaintiffs would not have purchased said trucks or paid a "premium" for such trucks.

**A. Damages**

267. As a proximate result of Defendants' conduct, Plaintiffs suffered actual damages. Damages are requested equal to the full amount charged to class members who paid a premium for an "Allison" transmission, but did not receive one; Plaintiffs request consequential damages equal to the value of the impact of the use of the GM Defendants' manufactured transmissions on the claimants trucks, including an impact whereby their trucks needed irregularly high levels of transmission repairs, and for some Plaintiffs, caused them to purchase a new truck from a different manufacturer. Plaintiffs request all consequential damages, however suffered.

268. The complaint also requests punitive damages against all Defendants based on willful, oppressive and fraudulent behavior.

269. A combination of failure to install an "Allison" manufactured transmission, as well as including a "GM" manufactured transmission, created a need to have irregularly high levels of repair issues. Some of the class members responded to the higher levels of repairs as being a reason to choose to purchase a new truck rather than suffer on with their current one. One of the further benefits received by GM and Allison is that the Scheme caused victims to choose to buy a new truck. Plaintiffs assert as a further component of damages, and as a further proximate result of the "Allison" transmission fraud, damages incurred due to the need to buy a new truck, in an amount according to proof.

270. The entire service costs of the transmission by the GM Defendants' network of independent "authorized" dealerships is estimated to be approximately

eight thousand six hundred fourteen dollars ($8,614.00); In 2024 alone, apparently four hundred sixty-one thousand eight hundred thirty-nine (461,839) trucks were affected due to a transmission control issue, thus, four hundred sixty-one thousand eight hundred thirty-nine (461,839) multiplied by eight thousand six hundred fourteen dollars ($8,614.00) equals a total damage figure of three billion nine hundred seventy-eight million two hundred eighty-one thousand one hundred forty-six dollars ($3,978,281,146.00.)

271. It is likely that the four hundred sixty-one thousand eight hundred thirty-nine (461,839) transmission failures represent four hundred sixty-one thousand eight hundred thirty-nine (461,839) different victims.

272. Plaintiffs do not have the breakdown of these allegations, but states that with four hundred sixty-one thousand eight hundred thirty-nine (461,839) instances of transmission failure involving tens of thousands of victims.

273. Similarly, the four hundred sixty-one thousand eight hundred thirty-nine (461,839) incidents stemming from the Scheme suggests that the three billion nine hundred seventy-eight million two hundred eighty-one thousand one hundred forty-six dollars ($3,978,281,146.00.) does not constitute the entire amount the GM Defendants would be liable for both labor and the parts.

274. The Plaintiffs claim damages for the entire amount for the repair service for each incidence of use of a non-Allison transmission by the Defendants. In the example of a transmission replacement, the entire service costs approximately eight thousand six hundred fourteen dollars ($8,614.00).

275. Plaintiffs claim for service amount and parts amount and total amount as damages herein.

276. This claim for the entire amount is based on the fact that Plaintiffs did not receive substantially what they bargained for; they purchased GM trucks that allegedly had an "Allison" transmission installed, instead, they received a GM manufactured transmission installed in the subject trucks.

277. In the alternative, Plaintiffs request for some other amount of damages and damage calculations that the court deems just and appropriate is on the basis that they paid for something that they did not receive. Their purchase required "Allison" manufactured transmissions installed in the subject trucks, and Plaintiffs and class members have also suffered compensatory and general damages, arising from the Scheme, as described in this complaint, which negatively impact the GM trucks owned by Plaintiffs and consumers.

278. Plaintiffs also seek exemplary damages against Defendants based on the fact that Defendants had actual knowledge of the fraudulent scheme and chose to assist in covering it up and remaining quiet to the many customers of the GM Defendants. The Defendants conduct, in this regard, constitute fraudulent and oppressive conduct, and aided and abetted each other's, oppressive and malicious conduct. Exemplary damages are requested in an amount according to proof.

279. Had either Defendant done the right thing, and installed an actual "Allison" transmission, the Plaintiffs would have received their full bargain.

280. Plaintiffs thus request full damages against Defendants for directly participating in the false ad and directly participating in the fraudulent Scheme.

281. Plaintiffs herewith seek the following other relief:

282. Unless and until injunctive relief is issued by the court, Defendants will continue in their conduct, i.e., not replacing the GM manufactured transmissions with an "Allison" manufactured transmission. Plaintiffs accordingly request injunctive relief in the form of an order enjoining and prohibiting the defendants from using an enterprise to commit acts of mail fraud and wire fraud, and such other injunctive relief as the Court deems just and appropriate. Specifically, Plaintiffs request an injunction prohibiting defendants from advertising that the subject trucks contain and/or contains an "Allison" transmission.

283. For Defendants to provide an accounting of all profits earned as a result of their mutual transactions.

284. A combination of the use of non-"Allison" manufactured transmissions, including the use of Defendant GM's manufactured transmissions, created a need to have irregularly high levels of repair issues. Some of the class members likely responded to the higher levels of repairs as being a reason to choose to purchase a new truck rather than suffer on with their current one. One of the further benefits received by Defendants is that this use of non-"Allison" manufactured transmissions caused victims to choose to buy the subject trucks from the GM Defendant. Plaintiffs assert as a component of damages, as a further proximate result of this "Allison" transmission fraud, damages incurred due to the need to buy a new truck, in an amount according to proof.

285. Plaintiffs further seek such other relief as the Court deems just and appropriate.

286. WHEREFORE Plaintiffs Pray for relief as set forth below in the Prayer for Relief.

## SIXTH COUNT

## (Negligence)

## Plaintiffs Hall, Pages and California Sub-Class Against All Defendants

287. The allegations of paragraphs 1-286 are incorporated herein as though set forth in full.

288. Defendants have a duty under California law under Civil Code 1714(a) which provides: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself. The design, distribution, or marketing of firearms and ammunition is not exempt from the duty to use ordinary care and skill that is required by this section. The extent of liability in these cases is defined by the Title on Compensatory Relief."

289. Defendant breached that duty and committed negligence by the

following conduct:

290. Defendants represented to Plaintiff Hall that a fact was true, namely the inclusion of an "Allison" transmission.

291. The GM Defendants published the following that were false and misleading:

292. "Representing through its manufacturing "Monroney" window sticker, that the subject trucks contained an "Allison" transmission."; online advertisement from one of the GM Defendants' independent authorized dealerships stating that the truck actually contained an "Allison" transmission;" and as well as placing an "Allison Transmission" badge on the subject trucks; [See **Exhibit A, B, and C** respectively]

293. Defendants represented whether through direct statements, or misrepresentations, to Plaintiff Hall that a fact was true, namely that GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty would provide "Allison" manufactured replacement parts for the subject trucks.

294. These advertisements constitute a false and misleading negligent misrepresentation of fact.

295. The Allison Defendants are further liable herein, because they aided and abetted the GM Defendants in the fraudulent conduct. Allison Defendants aided and abetted the GM Defendants by allowing the GM Defendants to place an "Allison Transmission" badge on the GM Defendants trucks, knowing that the trucks did not actually contain an "Allison" manufactured transmission, or whether through direct statements, or misrepresentations, that GM Defendants' Manufacturer's Warranty and/or Extended Manufacturer's Warranty would provide "Allison" manufactured replacement parts for the subject trucks.

296. . Allison further aided and abetted the GM Defendants' conduct by engaging in a cover-up of the fact that the trucks did not contain an "Allison" manufactured transmission, and then attempting to end the Scheme with the GM

Defendants, when it learned of the issues of recalls with the GM Defendants transmissions, and chose to stay silent about it, and chose to not take corrective actions about it.

297. The Allison Defendants aider and abettor conduct was intentional, and was done with the realization and knowledge that its partner, namely, the GM Defendants, would commit an intentional wrongdoing, including the RICO violations alleged herein; the false and misleading ads, the "Monroney" window sticker, the "Allison Transmission Badge," as alleged herein; the intentional misrepresentations alleged herein; the intentional concealments alleged herein.

298. These fraudulent ads and publications were issued by Defendants during the period of approximately 2020 through 2025; the ads were disseminated through the GM Defendants' network of “authorized” independent dealerships as well directly by GM.

299. Defendants' representation was false as they were NOT using installing "Allison" manufactured transmissions in the subject trucks.

300. Defendants knew that the representation that they were installing "Allison" transmissions was false when they made it.

301. Defendants intended that Plaintiff Hall and consumers rely on the representation that they were installing including "Allison" transmissions in the subject trucks.

302. Plaintiff Hall and class members reasonably relied on Defendants' representation that "Allison" transmissions were being installed and invoiced for such transmissions.

303. Plaintiff Hall and class members were harmed as set forth below.

304. Plaintiff Hall and class members’ reliance on Defendants' representation that "Allison" transmissions were being installed was a substantial factor in causing their harm.

305. Had Plaintiff Hall and class members known the true facts that

"Allison" manufactured transmissions were not actually installed in the subject trucks, Plaintiffs would not have purchased the trucks or paid a "premium" for such trucks.

**A. Damages**

306. As a proximate result of Defendants' conduct, Plaintiff Hall and class members suffered actual damages. Damages are requested equal to the full amount charged to class members who paid a premium for an "Allison" transmission but did not receive and "Allison" manufactured transmission. Plaintiff Hall requests consequential damages equal to the value of the impact of the use of the GM Defendants transmissions on the subject trucks, including an impact whereby their trucks needed irregularly high levels of transmission repairs, and for some, caused them to purchase a new truck from a different manufacturer. Plaintiff requests all consequential damages, however suffered.

307. The complaint also requests punitive damages against all Defendants based on willful, oppressive and fraudulent behavior.

308. A combination of failure to install an "Allison" manufactured transmission, as well as installing a "GM" manufactured transmission, created a need to have irregularly high levels of repair issues. Some of the class members responded to the higher levels of repairs as being a reason to choose to purchase a new truck rather than suffer on with their current one. One of the further benefits received by GM and Allison that the Scheme also caused victims to choose to buy a new truck. Plaintiff Hall further asserts as a further component of damages, and as a further proximate result of the "Allison" transmission fraud, damages incurred due to the need to buy a new truck, in an amount according to proof.

309. The entire service costs of the transmission by the GM Defendants' "authorized" dealerships is estimated to be approximately eight thousand six hundred fourteen dollars ($8,614.00); In 2024 alone, apparently four hundred sixty-one thousand eight hundred thirty-nine (461,839) trucks were affected due to a

transmission control issue, thus, four hundred sixty-one thousand eight hundred thirty-nine (461,839) multiplied by eight thousand six hundred fourteen dollars ($8,614.00) equals a total damage figure of thee billion nine hundred seventy-eight million two hundred eighty-one thousand one hundred forty-six dollars ($3,978,281,146.00.)

310. It is likely that the four hundred sixty-one thousand eight hundred thirty-nine (461,839) transmission failures represent four hundred sixty-one thousand eight hundred thirty-nine (461,839) different victims.

311. Plaintiffs do not have the breakdown of these allegations, but states that with four hundred sixty-one thousand eight hundred thirty-nine (461,839) instances of fraud involving tens of thousands of victims.

312. Similarly, the four hundred sixty-one thousand eight hundred thirty-nine (461,839) incidents of transmission control failure suggests that the three billion nine hundred seventy-eight million two hundred eighty-one thousand one hundred forty-six dollars ($3,978,281,146.00.) does not constitute the entire amount the GM Defendant would be liable for both labor and the parts.

313. The Plaintiffs and class members claim damages for the entire amount for the repair service for each incidence of use of a non “Allison” manufactured transmissions by the Defendants. In the example of a transmission replacement, the entire service costs approximately eight thousand six hundred fourteen dollars ($8,614.00).

314. Plaintiff Hall claim for service amount and parts amount and total amount as damages herein.

315. This claim for the entire amount is based on the fact that Plaintiff Hall and class members did not receive substantially what they bargained for; they purchased GM trucks that allegedly had an "Allison" transmission installed, instead, they received a GM manufactured transmission installed in the subject trucks.

316. In the alternative, Plaintiff Hall and class members request for some

other amount of damages and damage calculations that the court deems just and appropriate is on the basis that they paid for something that they did not receive. Their purchase required "Allison" manufactured transmissions, and Plaintiffs and class members have also suffered compensatory and general damages, arising from the Scheme, as described in this complaint, negatively impact the GM trucks owned by Plaintiffs herein.

317. Plaintiff Hall and class members also seek exemplary damages against Defendants based on the fact that Defendants had actual knowledge of the fraudulent scheme and chose to assist in covering it up and remaining quiet to the many customers of the GM Defendants. The Defendants conduct, in this regard, constitute fraudulent and oppressive conduct, and aided and abetted each other's, oppressive and malicious conduct. Exemplary damages are requested in an amount according to proof.

318. Had either Defendant done the right thing, and installed an actual "Allison" manufactured transmission, the Plaintiff Hall would have received the bargain of the benefit.

319. Plaintiff Hall thus request full damages against Defendants for directly participating in the false ad and directly participating in the transmission fraud.

320. Plaintiff Hall herewith seeks the following other relief:

321. Unless and until injunctive relief is issued by the court, Defendants will continue in their conduct, i.e., not replacing the GM manufactured transmissions with an "Allison" manufactured transmission. Plaintiff Hall accordingly request injunctive relief in the form of an order enjoining and prohibiting the Defendants from using an enterprise to commit acts of mail fraud and wire fraud, and such other injunctive relief as the Court deems just and appropriate. Specifically, Plaintiff Hall request an injunction prohibiting Defendants from advertising that the subject trucks contain and/or contains an "Allison" transmission.

322. For Defendants to provide an accounting of all profits earned as a result

of their mutual transactions.

323. A combination of the use of non "Allison" manufactured transmissions, and instead installing Defendant GM's manufactured transmissions, created a need to have irregularly high levels of repair issues. Some of the class members likely responded to the higher levels of repairs as being a reason to choose to purchase a new truck rather than suffer on with their current one. One of the further benefits received by Defendants is that the Scheme caused victims to choose to buy the subject trucks from the GM Defendant. Plaintiff Hall and class members assert as a component of damages, as a further proximate result of this "Allison" transmission fraud, damages incurred due to the need to buy a new truck, in an amount according to proof.

324. Plaintiff Hall and class members further seek such other relief as the Court deems just and appropriate.

325. WHEREFORE Plaintiffs Pray for relief as set forth below in the Prayer for Relief.

**SEVENTH COUNT**

**(Breach of Express Warranty)**

**Plaintiffs and All Class Members Against All Defendants**

326. The allegations of paragraphs 1-325 are incorporated herein as though set forth in full.

327. The Uniform Commercial Code, U.C.C.§ 2-313(1), and California Commercial Code § 2313states that:

Express warranties by the seller are created as follows:

> (a)Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b)Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c)Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2)It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

328. Defendant's representation of an "Allison" transmission on its "Monroney" window sticker as well as the "Allison Transmission" badge on the subject trucks of the GM Defendants formed a part of the basis of the bargain between Defendant, Plaintiffs and Class members, and it created an express warranty that the products shall conform to the affirmation, promise, or description on the packaging.

329. Defendants breached their express warranty by selling and advertising subject trucks of the GM Defendants as "Allison" transmissions, when in fact the "Allison" transmissions in the subject trucks were not Allison transmissions, but instead, transmission manufactured by the GM Defendants. The products were not manufactured by the Allison Defendants as expressly warranted.

330. All conditions precedent have occurred or been performed.

331. As a direct and proximate result of Defendant's breach of its express warranty, Plaintiffs and Class members suffered damages by purchasing the GM Defendant's trucks because they would not have purchased the subject trucks and paid a premium had they known the truth (i.e., the transmissions installed in the

subject trucks were GM manufactured transmissions), or they would have paid less for them, and they received products that were worth less than the price they paid.

**EIGTH COUNT**

**(Breach of Implied Warranty)**

**Plaintiffs and the Class Against All Defendants**

332. The allegations of paragraphs 1-331 are incorporated herein as though set forth in full.

333. Unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. U.C.C.§ 2-314(1); Under the laws of California and other states, these implied warranty protections may also be enforced against the manufacturer of a product. Cal. Civil Code § 1791.1.

334. To be merchantable, goods must, among other things, pass without objection in the trade under the contract description, and conform to promises or affirmations of fact made on the container or label. U.C.C. § 2-314(2)(a), (2)(f); Cal. Civil Code § 1791.1.

335. The GM Defendants manufactured the alleged "Allison" transmissions that are installed in the subject trucks and sold those products as "Allison" transmissions to Plaintiffs and Class members.

336. The GM Defendant's "Allison" transmissions contained a defect such that the products would not pass without objection under the contract description, and they do not conform to the promises and affirmations of fact made on the "Monroney" window sticker or label that the trucks contain "Allison Transmissions," because these products not manufactured by the Allison Defendants. As a result of the defect, GM Defendant's products (i.e., GM manufactured transmissions do not meet the reasonable expectations of consumers. The products have failed their ordinary, intended uses under the contract description and affirmations of fact on the products' packaging.

337. Accordingly, Defendants breached the implied warranty of merchantability because the alleged "Allison" transmissions products would not pass without objection under the contract description, and they do not conform to the promises and affirmations of fact made on the subject trucks or "Monroney" window sticker that the subject trucks contain "Allison" transmissions," because these products are manufactured by the GM Defendants.

338. This defect existed at the time the subject vehicles left the GM Defendants' control.

339. All conditions precedent have occurred or been performed.

340. As a direct and proximate result of Defendant's breach of the implied warranty,

341. Plaintiffs and Class members suffered damages by purchasing GM Defendants trucks that are the subject of this action, because they would not have purchased them had they known the truth, or they would have paid less for them, and they received products that were worth less than the price they paid.

**NINTH COUNT**

**(Violation of the Consumer Fraud and Deceptive Trade Practices Acts of the Various States and District of Columbia)**

**Plaintiffs and All Class Members Against All Defendants**

342. The allegations of paragraphs 1-341 are incorporated herein as though set forth in full.

343. Plaintiffs bring this Count individually, and on behalf of all similarly situated.

344. Residents of each of the 50 states and the District of Columbia for violations of the respective statutory consumer protection laws, as follows:

a. the Alabama Deceptive Trade Practices Act, Ala.Code 1975, § 8–19–1, et seq.;

b. the Alaska Unfair Trade Practices and Consumer Protection Act, AS § 45.50.471, et seq.;

c. the Arizona Consumer Fraud Act, A.R.S §§ 44-1521, et seq.;

d. the Arkansas Deceptive Trade Practices Act, Ark.Code §§ 4-88-101, et seq.;

e. the California Unfair Competition Law, Bus. & Prof. Code §§17200, et seq. and 17500 et seq.;

f. the California Consumers Legal Remedies Act, Civil Code §1750, et seq.;

g. the Colorado Consumer Protection Act, C.R.S.A. §6-1-101, et seq.;

h. the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110, et seq.;

i. the Delaware Consumer Fraud Act, 6 Del. C. § 2513, et seq.;

j. the D.C. Consumer Protection Procedures Act, DC Code § 28-3901, et seq.;

k. the Florida Deceptive and Unfair Trade Practices Act, FSA § 501.201, etseq.;

l. the Georgia Fair Business Practices Act, OCGA § 10-1-390, et seq.;

m. the Hawaii Unfair Competition Law, H.R.S. § 480-1, et seq.;

n. the Idaho Consumer Protection Act, I.C. § 48-601, et seq.;

o. the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1 et seq.;

p. the Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, et seq.;

q. The Iowa Private Right of Action for Consumer Frauds Act, Iowa Code Ann. § 714H.1, et seq.;

r. the Kansas Consumer Protection Act, K.S.A. § 50-623, et seq.;

s. the Kentucky Consumer Protection Act, KRS 367.110, et seq.;

t. the Louisiana Unfair Trade Practices and Consumer Protection Law, LSAR. S. 51:1401, et seq.;

u. the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A, et seq.;

v. the Maryland Consumer Protection Act, MD Code, Commercial Law, § 13-301, et seq.;

w. the Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, et seq.;

x. the Michigan Consumer Protection Act, M.C.L.A. 445.901, et seq.;

y. the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68,et seq.;

z. the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, et seq.;

aa. the Missouri Merchandising Practices Act, V.A.M.S. § 407, et seq.;

bb. the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101, et seq.;

cc. the Nebraska Consumer Protection Act, Neb.Rev.St. §§ 59-1601, et seq.;

dd. the Nevada Deceptive Trade Practices Act, N.R.S. 41.600, et seq.;

ee. the New Hampshire Regulation of Business Practices for Consumer Protection, N.H.Rev.Stat. § 358-A:1, et seq.;

ff. the New Jersey Consumer Fraud Act, N.J.S.A. 56:8, et seq.;

gg. the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1, et seq.;

hh. the New York Consumer Protection from Deceptive Acts and Practices, N.Y. GBL (McKinney) § 349, et seq.;

ii. the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, et seq.;

jj. the North Dakota Consumer Fraud Act, N.D. Cent.Code Chapter 51-15, et seq.;

kk. the Ohio Consumer Sales Practices Act, R.C. 1345.01, et seq.;

ll. the Oklahoma Consumer Protection Act, 15 O.S.2001, §§ 751, et seq.;

mm. the Oregon Unlawful Trade Practices Act, ORS 646.605, et seq.;

nn. the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq.;

oo. the Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1-5.2(B), et seq.;

pp. the South Carolina Unfair Trade Practices Act, SC Code 1976, §§ 39-5-10, et seq.;

qq. the South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL § 37-24-1, et seq.;

rr. the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, et seq.;

ss. the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, et seq.;

tt. the Utah Consumer Sales Practices Act, UT ST § 13-11-1, et seq.;

uu. the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, et seq.;

vv. the Virginia Consumer Protection Act of 1977, VA ST § 59.1-196, et seq.;

ww. the Washington Consumer Protection Act, RCWA 19.86.010, et seq.;

xx. the West Virginia Consumer Credit And Protection Act, W.Va.Code § 46A-1-101, et seq.;

yy. the Wisconsin Deceptive Trade Practices Act, WIS.STAT. § 100.18, et seq.; and

zz. the Wyoming Consumer Protection Act, WY ST § 40-12-101, et seq.

345. The GM Defendants' trucks as well as the Allison Defendants' transmissions are consumer goods.

346. Defendants made false and fraudulent statements, and misrepresented material facts regarding the GM Defendants' trucks containing "Allison" transmissions, by making false representations on the products' "Monroney" window stickers that the products were "Allison" transmissions when, in fact, they were manufactured by the GM Defendants.

347. Defendants concealed and omitted material facts regarding the alleged "Allison" transmissions that were installed in the GM Defendants trucks.

348. As alleged above, Defendants' conduct is in violation of the FTC's "Unfair or Deceptive Practices." FTC Act, 15 U.S.C. § 45.

349. Defendants' misrepresentations, omissions, and concealment constitute unfair and deceptive acts or practices.

350. Defendants' misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

351. Defendants intended that Plaintiffs and class members rely on its false statements, misrepresentations, omissions, and concealment of material facts in purchasing the GM Defendants' trucks.

352. Plaintiffs and Class members reasonably relied on Defendants' misrepresentations, omissions, and concealment when they purchased the GM Defendants' trucks that are subject of this action.

353. Acting as reasonable consumers, had Plaintiffs and Class members been aware of the true facts regarding the origin or source of the source of the "Allison" transmissions installed in the subject trucks, they would not have purchased them or would have paid a lower price for the products than they paid.

354. Plaintiffs and Class members suffered injuries in fact—i.e., the loss of

the money that they paid for GM trucks that were not as advertised and represented.

355. As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiffs and Class members suffered damages by purchasing the GM Defendants' trucks because they would not have purchased them had they known the truth, or they would have paid less for them, and they received products that were worth less than the price they paid.

**TENTH COUNT**

**VIOLATION OF CONSUMERS LEGAL REMEDIES ACT (CIV.CODE §§ 1750 ET SEQ.))**

**Plaintiff Erik Hall and California Sub-Class Members Against All Defendants**

356. Plaintiffs refer to all of the foregoing paragraphs and incorporates herein by this reference those paragraphs as though fully set forth herein.

357. This cause of action is brought under the California Consumer Legal Remedies Act (Cal. Civ. Code § 1750, et seq.) (CLRA).

358. Plaintiffs and other members of the California Sub-Class are "consumers" as defined by California Civil Code section 1761, subdivision (d).

359. Defendants' trucks products are "goods" as defined by California Civil Code section 1761, subdivision (a).

360. Defendants' conduct as alleged herein constitutes a "transaction" within the meaning of Civil Code section 1761, subdivision (e).

361. The CLRA applies to Defendants' actions and conduct described herein because it extends to transactions that are intended to result, or which have resulted, in the sale of goods to consumers for personal, family, or household use.

362. The CLRA, as set forth in Civil Code § 1760, "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." To that end, the CLRA sets forth a list of unfair methods of competition and unfair or deceptive acts and

practices in Civil Code section 1770 that are deemed unlawful.

363. Throughout the relevant time-period, Defendants violated, and continue to violate, the CLRA through the following unlawful conduct:

364. "Misrepresenting the source, sponsorship, approval or certification of goods or services" (Civ. Code § 1770(a)(2));

365. "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have" (Civ. Code § 1770(a)(5));

366. "Representing that goods or services are of a particular standard, quality, or grade . . . if they are of another" (Civ. Code §1770(a)(7));

367. "Advertising goods or services with intent not to sell them as advertised" (Civ. Code §1770(a)(9)); and

368. "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not" (Cal. Civ. Code § 1770(a)(16).

369. Plaintiffs and the members of the California Sub-Class have suffered harm as a result of Defendants' use or employment of methods, acts, or practices declared unlawful by California Civil Code section 1770, and as set forth specifically above.

370. Accordingly, Plaintiffs seek an order enjoining Defendants from continuing to employ the unlawful methods, acts, and practices alleged above in whatever context it occurs, pursuant to Civil Code, section 1780, subdivision (a)(2).

371. Plaintiffs seek reasonable attorneys' fees pursuant to Civil Code section 1780(e).

///

///

///

///

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, demands judgment against Defendants as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class and/or Subclass as defined herein;

b. An order certifying the Class and Subclasses for declaratory and injunctive relief and for money damages under Federal Rules of Civil Procedure Rule 23;

c. Appointing Plaintiffs as Class and Subclasses Representatives and appointing her attorneys as Class Counsel;

d. A declaratory judgment that Defendants violated the UCL and/or RICO and any settlement entered into as a result of the Scheme are null and void as fraudulent;

e. A judgment for injunctive relief enjoining Defendants from engaging in future violations of the UCL and/or RICO; orders Defendants engage in a corrective notice campaign, and requiring Defendants to refund to Plaintiffs and all Class Members the funds paid;

f. An accounting of all amounts that Defendants collected from Plaintiff and Class Members as a result of the Scheme;

g. A judgment for actual damages;

h. A judgment for compensatory damages;

i. A judgment for disgorgement of profits under the UCL;

j. A judgment for treble damages under RICO;

k. A judgment for reasonable attorney fees and costs of suit in connection with this action, pursuant to the UCL and/or RICO, California Civil Code § 1780(e) and California Civil Procedure Code § 1021.5, and any other applicable statute;

l. A judgment for pre-judgment and post-judgment interest; and/or

m. ; and

n. A judgment for all such other and further relief as the Court deems equitable and just.

Dated: July 2, 2026

**MAHONEY LAW GROUP, APC**

Berkeh Alemzadeh, Esq.
Attorneys for Plaintiffs, ERIK HALL, LYLE GREEN, FRANK MAGANA, DAVID PAGES. BRANT TANNER, and on behalf of all others similarly situated.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues subject to trial.

Dated: July 2, 2026

**MAHONEY LAW GROUP, APC**

______________________________

Berkeh Alemzadeh, Esq.
Attorneys for Plaintiffs, LYLE GREEN, FRANK MAGANA, BRANT TANNER, and on behalf of all others similarly situated.